# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 98-100


Paul L. Faust, Appellant,

v.

Togo D. West, Jr.
Secretary of Veterans Affairs, Appellee.


On Appeal from the Board of Veterans' Appeals


(Decided  February 15, 2000   )


*Stephen M. Needham*, of Milwaukee, Wisconsin, was on the pleadings for the appellant.

*Leigh A. Bradley*, General Counsel; *Ron Garvin*, Assistant General Counsel; and *Jacqueline M. Sims*, Acting Deputy Assistant General Counsel, all of Washington, D.C., were on the pleading for the appellee.

Before FARLEY, IVERS, and STEINBERG, *Judges*.

STEINBERG, *Judge*: The appellant, veteran Paul L. Faust, appeals through counsel an October 28, 1997, decision of the Board of Veterans' Appeals (BVA or Board) that reduced from 100% to 70% his Department of Veterans Affairs (VA) disability rating for service-connected post-traumatic stress disorder (PTSD).  Record (R.) at 2.  The appellant has filed a brief, the Secretary has filed a motion for single-judge affirmance, and the appellant has filed what he styles as a motion in opposition to the Secretary's motion and requesting single-judge reversal.  This appeal is timely, and the Court has jurisdiction pursuant to 38 U.S.C. §§ 7252(a) and 7266(a).  For the reasons that follow, the Court will deny the parties' motions for single-judge disposition and, by this panel opinion, affirm the BVA decision.


## I. Relevant Background

The veteran had active service in the U.S. Army from May 1968 to May 1972, including

service as a helicopter pilot in Vietnam for which he received, inter alia, the Air Medal with Oak Leaf Cluster and the Distinguished Flying Cross. R. at 23. His service medical records (SMRs) reflected no psychiatric conditions. *See* R. at 26-189.

In October 1991, he filed with a VA regional office (RO) a claim for VA service connection for "Post Traumatic Stress". R. at 191. In June 1992, the VARO awarded service connection for PTSD and assigned a 50% rating, effective October 1991. R. at 370-71. The following month, the veteran submitted a Notice of Disagreement (NOD). R. at 372. In April 1993, he testified under oath at a hearing before the RO. He described having nightmares that he said were triggered by seeing helicopters on television (R. at 449-50) and indicated that he was "very susceptible to loud noises" (R. at 450), had difficulty concentrating (R. at 452), and had problems with anger (R. at 453) and depression (R. at 449-55). He further testified that he had, "over the years", sold insurance and investments but had not sold any "in probably three years and the renewals are decreasing every year". R. at 456. He also apparently submitted documentation in support of his testimony that his taxable income in 1991 had been $675, whereas in 1987 he had earned $52,000. R. at 456-57. In May 1993, a board of two VA psychiatrists opined that the veteran's PTSD "is quite severe and that he appears to be nearly completely disabled secondary by [sic] it" and also stated: "[W]e would like to emphasize that we believe [that] he is more than 50% disabled secondary to [PTSD]". R. at 482.

Based on the April 1993 hearing, the hearing officer in July 1993 issued a decision in which he stated:

> The evidence in its entirety demonstrated that the veteran's [PTSD] results in a severe social and industrial impairment and warrants . . . a 70% evaluation pursuant to the provisions of 38 C.F.R. [§] 4.132, Diagnostic Code [(DC)] 9411 [(1996)] . . . . However, when applying the provisions of 38 C.F.R. [§] 4.16([c)] the veteran is entitled to a 100% evaluation since the evidence shows as substantiated by his 1991 income tax return that he is unable to engage in substantially gainful employment.

R. at 491. The RO then issued an August 1993 decision that, "[i]n accordance with the [h]earing [o]fficer['s] decision", assigned a 100% rating, effective October 1991, for PTSD, based on the hearing officer's having "found [a] reasonable basis for increased rating for service[-]connected PTSD including total (100%) evaluation under provisions of 38 C.F.R. [§] 4.16(c) related to veteran's inability to engage in substantially gainful employment." R. at 494. An August 1993 letter from the RO then informed the veteran that, because it had "granted the benefits sought", his appeal

2

was "considered to be withdrawn".  R. at 498.

In July 1994, the veteran's former spouse, Ms. Johnson, filed a claim for apportionment of the veteran's benefits on behalf of his son; Ms. Johnson submitted documentation -- including financial statements from a business that she and the veteran had operated together and documents related to family-court proceedings -- that indicated that the veteran had earned $48,000 in 1993. R. at 504-40.  In August 1994, the veteran confirmed under oath before the RO that he had earned $48,000 in 1993.  R. at 554.

As part of a September 1994 VA social and industrial survey, the veteran related that he was self-employed and that "he pull[ed] a high salary . . . [, but because] the business itself [was] not making money" his business was "barely breaking even".  R. at 570.  It was noted that he "appeared alert, oriented, and cooperative" and showed "no signs of psychotic behavior" but "was tearful at times throughout the interview and spoke of high levels of anxiety, both in the session . . . and for the past several months".  The survey included a recommendation that the veteran undergo ongoing therapy and a future reevaluation.  *Ibid.*

In March 1995, the veteran submitted to the RO a request for copies of Ms. Johnson's statements in support of her claim for apportionment.  R. at 574.  In April 1995, a "Veterans Service Officer" (VSO) at the RO notified the veteran as follows:

> Under confidentiality rules, I may not release documents concerning one party to another without written permission.  I do not have Ms. Johnson's written permission to release copies of her documents to you.
>
> As a result, I must deny your request under the provisions of the Privacy Act, Title 5, United States Code, Section 552a, and Title 38, United States Code, Section 5701.
>
> ***If you do not agree with this decision, you may appeal in writing*** to: [VA's Office of General Counsel (OGC) (address provided)].

R. at 560 (emphasis added).

At a VA PTSD examination undertaken in April 1995, the veteran described himself as having unchanged PTSD symptomatology.  R. at 578.  In the examiner's report, following a discussion of that symptomatology, it was noted: "Per the patient's history, and in comparison to the prior . . . exam[ination] done 5/20/93, the only significant change for the better that the patient is

reporting is that he is making more money and [is] able to support himself a little better. . . . I cannot see any significant changes at this time other than the increased income." R. at 579. The RO in April 1995 determined that the veteran met the criteria for a 100% PTSD rating, which then required, inter alia, the following: "The attitudes of all contacts except the most intimate are so adversely affected as to result in virtual isolation in the community[,] . . . [t]otally incapacitating psychoneurotic symptoms bordering on gross repudiation of reality[, and] . . . . [d]emonstrably unable to obtain or retain employment". R. at 582 (citing "38 C.F.R. [§] 4.132, DC 9411").

In May 1995, the veteran testified under oath at a hearing before the RO regarding the apportionment claim. R. at 585-94. He indicated that his salary was $3,000 a month and his VA compensation was $2,065 a month. R. at 585. Later that month, the RO received documents, apparently from the veteran, indicating that he had earned $38,000 in 1994. R. at 596-612. In July 1995, he requested "copies of the income and expense report(s) submitted by [Ms.] Johnson." R. at 615. In July 1995, the VSO again refused to provide copies of those documents to the veteran and notified him of his right to appeal the VSO's decision to VA's OGC; the VSO also indicated that Ms. Johnson had "reported her net income as $566.42 monthly plus child support [and that her] expenses . . . were $2561 monthly." R. at 617.

The RO issued a June 1995 decision concluding that the veteran's PTSD was "greatly over evaluated based on his current employment status", and stating that a psychiatric examination should be conducted "at once". R. at 619. At an August 1995 VA PTSD examination, the veteran reported that he had earned $36,000 in 1994, "based on business that he developed prior to PTSD becoming a problem for him in 1991", and that since 1991 he had not experienced growth in his income. R. at 622. He also stated that he was "unable to work more than two days a week on average because of his PTSD." R. at 623. The examiner diagnosed the veteran as continuing to have PTSD and indicated that he suffered "[m]ajor impairment in work, mood[,] and family relations." R. at 625.

In a September 1995 decision, the RO, noting that the veteran was "self-employed and that he [was] earning more than marginal income from his business", proposed that his "service[-]connected nervous disorder, which is currently 100[%] disabling, . . . be decreased to 70[%]." R. at 628. The RO specifically noted as well that the veteran had "indicated that there had been no change in the frequency or the severity of his PTSD symptoms." R. at 629. He was notified

4

of the rating-reduction proposal (R. at 632) and requested the opportunity to be heard regarding the proposed decrease (R. at 635). He also requested in November 1995 a copy of the transcript of the May 1995 testimony of Ms. Johnson, and was again denied access to Ms. Johnson's record and notified that he had a right to appeal that VSO determination to VA's OGC. R. at 651.

At a February 1996 hearing before the RO, the veteran testified under oath that he "might effectively work three days a week". R. at 656-57; *see also* R. at 661 (veteran's sworn testimony that in the past he had been able to work 60-70 hours per week, but, due to the PTSD, was only able to work 16 hours per week). He stated that his salary was then $36,000/year (R. at 657) but asserted that if he "would be able to work effectively [he] . . . should be able to do well in excess of $100,000" (R. at 660); he appears to have been asserting that if he were not the owner of the business he would have been fired from his position due to his short work hours and the fact that "since 1991" he had not "added any new clients" (R. at 668). In March 1996, the RO reduced from 100% to 70% the veteran's rating for service-connected PTSD, effective June 1996. R. at 676. The RO noted that such a reduction "may be made when the evidence shows that improvement has been made in the severity of the PTSD symptoms." *Ibid.* The RO also stated: "The veteran's [PTSD] is not considered static (unchanging); therefore, a future examination will be scheduled to review this disability." R. at 677. The veteran filed an NOD in April 1996. R. at 683.

An April 1996 VA outpatient psychiatric record noted that the veteran had indicated that he was unable "to work with others" but also had "ongoing compulsive work habits to avoid depression." R. at 695. In May 1996, he made a fourth attempt to obtain information from Ms. Johnson's claims file and was again notified by the VSO that such information was "protected" and that he could appeal to VA's OGC. R. at 691. In September 1996, the RO issued an SOC as to the reduction of his PTSD rating, citing, inter alia, "38 C.F.R. [§] 3.343". R. at 732-43.

In August 1997, the Board received the following statement from Ms. Johnson: "I HEREBY REQUEST TO WITHDRAW MY APPEAL FOR APPORTIONMENT." R. at 831. Also in August 1997, the veteran testified under oath before the Board that his PTSD condition had not "changed at all" since 1991. R. at 835. He reiterated that during "a really good week" he was able to work as much as 16 hours (R. at 836) and stated that his business had declined since 1991 and was operating at a year-to-date loss of $40,000. R. at 842-45. In the October 28, 1997, BVA decision here on appeal,

5

the Board noted that the veteran's 100% PTSD rating, assigned by the RO in August 1993 (R. at 494), had been "based on nonmedical evidence which revealed that the veteran was incapable of employment (primarily his W-2 for 1991)" (R. at 16) and that more recent evidence showed him to be earning "$48,000 in 1993 and that his income for 1994 was $3,000 per month" (R. at 18). In addition, the Board stated that the fact that the veteran "is not meeting his full potential in the workplace" did not support an award of a rating of 100% for his service-connected PTSD. R. at 17. The Board concluded that the "preponderance of the evidence support[ed] a reduction in the evaluation of the veteran's PTSD from 100 to 70[%]." R. at 2.

## II. Analysis

The appellant makes multiple arguments. First, he argues that the Board erred when it reduced his 100% rating in "the absence of any statement [indicating] . . . that [his] medical diagnosis and/or medical condition had improved" (Brief (Br.) at 4) and when it "rel[ied] on information submitted by the ex-wife [(Ms. Johnson), and] . . . then depriv[ed him] of that information in his own defense" (Br. at 8). He relies on arguments based on VA's failure to follow its own regulations (*see, e.g.,* Br. at 4-7) and on "due process" (without citing to any due process provision(s) in the U.S. Constitution) (*see, e.g.,* Br. at 8). As to the latter arguments, the Court is not inclined to address such vague "due process" arguments. *See Brewer v. West*, 11 Vet.App. 228, 236-37 (1998) (Court need not address "mere assertions of constitutional impropriety for which he has not provided any legal support", citing, inter alia, *Gov't and Civic Employees Organizing Comm., CIO v. Windsor*, 353 U.S. 364, 366 (1957) ("Federal courts will not pass upon constitutional contentions presented in an abstract rather than in a concrete form"), and *U.S. v. M. Genzale Plating, Inc.*, 723 F. Supp. 877, 885 (E.D.N.Y. 1989) ("[v]ague assertions of unfairness on the part of the government, without more, cannot be molded into constitutional violations")); *see also Chastain v. West*, __ Vet.App. __, __, No. 97-1161, slip op. at 6 (Jan. 24, 2000) (citing *Brewer, supra*).

As to the appellant's assertions that VA failed to follow its own regulations in this case, "[t]he BVA is not free to ignore regulations that the Secretary has promulgated consistent with his statutory authority. . . . Rather, '[t]he BVA is required to apply all relevant statutes and regulations appropriate to the particular case before it.'" *Wilson (Merritte) v. West*, 11 Vet.App. 383, 385 (1998) (citations

omitted) (holding that failure of VA to follow its own regulations in terminating dependency and indemnity compensation benefits, based on severance of service connection, constituted prejudicial error); *see also Patton v. West*, 12 Vet.App. 272, 283 (1999) ("the Court believes that substantial interests of justice dictate that the Court require the Secretary to adhere to his own regulatory provisions"); *Buzinski v. Brown*, 6 Vet.App. 360, 367 (1994) ("we agree that . . . VA is obligated to follow the regulations it promulgates" (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 269 (1954); *Vitarelli v. Seaton*, 359 U.S. 535, 539 (1959))). The Court has specifically required VA to follow its own regulations when it attempts to reduce a veteran's rating. *See Fugere v. Derwinski*, 1 Vet.App. 103 (1990) (holding that VA was required to give notice and opportunity to be heard prior to deleting provision of VA Adjudication Procedure Manual M21-1 that had provided regulatory-like procedural protections prior to reducing veteran's rating, and noting: "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." (citations omitted)), *aff'd*, 972 F.2d 331 (Fed. Cir. 1992). The Court determines de novo whether VA has followed and applied its own regulations in reducing or terminating VA benefits. *See Wilson (Merritte)* (making determination de novo without so stating) and *Fugere* (same), both *supra*; *Brown (Kevin) v. Brown*, 5 Vet.App. 413, 416-21 (1993) (same); *cf. Buzinski, supra* (reviewing de novo compliance with VA regulation regarding mortgage foreclosure). If VA affords to a veteran the applicable procedural protections and nonetheless determines that a reduction in rating is warranted, the determination as to the degree of disability under the applicable diagnostic code is a finding of fact subject to the "clearly erroneous" standard of review. *See Smallwood v. Brown*, 10 Vet.App. 93, 97 (1997); *Gilbert v. Derwinski*, 1 Vet.App. 49, 53 (1990). In determining whether a finding is clearly erroneous, "this Court is not permitted to substitute its judgment for that of the BVA on issues of material fact; if there is a 'plausible basis' in the record for the factual determinations of the BVA . . . , [the Court] cannot overturn them." *Ibid.*

### A. General Rating-Reduction Matters

Prior to reducing a veteran's disability rating, the Board is required to comply with several *general* VA regulations applicable to all rating-reduction cases, regardless of the rating level or the length of time that the rating has been in effect. *See* 38 C.F.R. §§ 4.1, 4.2, 4.10 (1999); *Brown (Kevin)*, 5 Vet.App. at 420. "These provisions impose a clear requirement that VA rating reductions,

as with all VA rating decisions, be based upon review of the entire history of the veteran's disability."

*Ibid.* (citing *Schafrath v. Derwinski*, 1 Vet.App. 589, 594 (1991)).

> [Such review requires VA] to ascertain, based upon review of the entire recorded history of the condition, whether the evidence reflects an actual change in the disability and whether the examination reports reflecting such change are based upon thorough examinations . . . . Thus, in any rating-reduction case not only must it be determined that an improvement in a disability has actually occurred but also that that improvement actually reflects an improvement in the veteran's ability to function under the ordinary conditions of life and work.

*Brown (Kevin)*, 5 Vet.App. at 421; *see also Schafrath*, *supra* ("[t]hese requirements for evaluation of the complete medical history of the claimant's condition operate to protect claimants against adverse decisions based on a single, incomplete[,] or inaccurate report and to enable VA to make a more precise evaluation of the level of disability and of any changes in the condition").

Although it is true that the record on appeal (ROA) contains no ***medical*** evidence of a change in the veteran's PTSD symptomatology, the Board noted that the RO had originally (in August 1993) assigned a 100% rating "based on ***nonmedical*** evidence which revealed that the veteran was incapable of employment (primarily his W-2 for 1991)." R. at 16 (emphasis added); *see also* R. at 493-94 (August 1993 RO decision relying on July 1993 hearing officer decision that had concluded that 100% rating was warranted based on veteran's "1991 income tax return that [showed that] he is unable to engage in substantially gainful employment"). Thereafter, evidence was submitted that he was in fact employed and earned substantial income. *See, e.g.,* R. at 554 (veteran's August 1994 sworn testimony that he had earned $48,000 in 1993); R. at 579 (April 1995 VA examination at which veteran reported "that he is making more money and [is] able to support himself a little better"); R. at 622 (August 1995 VA PTSD examination report indicating that veteran stated that he had earned $36,000 in 1994 and worked two days per week). Although none of that evidence indicated a change or medical improvement in the veteran's PTSD symptomatology, that evidence did show improvement as measured by the ***nonmedical criteria*** -- his earnings -- that had been used by the RO in its August 1993 assignment of a 100% PTSD rating. Based on the BVA's determination that the RO had relied upon nonmedical evidence such as the veteran's 1991 tax return cited by the hearing officer, the evidence ***does*** reflect "an actual change in the disability", *Brown (Kevin)*, 5 Vet.App. at 520, because the veteran's earned income had dramatically increased from

"$675" in 1991 to "$48,000" in 1993 and was still "$36,000 in 1994" (R. at 456-57, 554, 622).

The appellant argues that the use of purely economic evidence to find an improvement in his disability violates the requirement that a disability undergo an "***actual change*** . . . based upon thorough examinations", *Brown (Kevin),* 5 Vet.App. at 421 (emphasis added), before a reduction in rating may be instituted; however, there is nothing in the regulations cited above that ***requires*** that the "actual change" be one measured in terms of medical improvement or that it be based on medical data derived from examinations rather than on the "entire evidence of record", 38 U.S.C. § 7104(a); *see also* 38 C.F.R. § 19.7(a) (1999) (requiring that BVA decision be "based on a review of the entire record"). In the instant case, to allow this veteran to continue to receive a 100% rating when his 100% rating had been originally assigned based solely on "nonmedical", financial evidence (R. at 16) would force VA to continue to provide benefits as though the veteran were unemployable when, in fact, he had a job and was receiving a substantial income. On these facts, the Court will not require VA to continue the veteran's rating at 100% because "such interpretation [of the regulations relating to general rating reductions, i.e., 38 C.F.R. §§ 4.1, 4.2, and 4.10] leads to absurd results". Norman J. Singer, *Sutherland on Statutory Construction* § 46.07 (5th ed. 1992); *see United States v. Brown*, 333 U.S. 18, 25-26 (1948); *Brooks v. Donovan*, 699 F.2d 1010, 1011-12 (9th Cir. 1983); *Barrera v. West*, 13 Vet.App. 139, 141 (1999) (Kramer, J., concurring). The Court also notes that if we were to require that medical evidence of improvement be present prior to reducing the veteran's rating, we would apparently be forced to disregard the provisions of 38 C.F.R. § 3.343 (1999), discussed in part II.B., below, that provide that in certain cases evidence of employability ***should*** be used as a basis to reduce a rating of total disability based on individual unemployability (TDIU).

As to the veteran's assertions that if he were not disabled by PTSD he would "be able to [earn] . . . well in excess of $100,000", that his business has been in a steady decline, and that if he were not the owner of his own business he would be unable to work for that business or for any other employer (R. at 660, 668 (February 1996 testimony); *see also* R. at 836-40), the Board stated:

> The Board notes that the veteran has argued that as a result of his PTSD he is unable to earn the type of salary consistent with his education and background. In addition, the veteran asserts that this business has not grown since 1991 and is on the decline. The Board notes that the criteria for a 100[%] evaluation requires [sic] that the veteran is demonstrably unable to obtain or retain employment (old criteria [sic]) or has total occupational impairment (new criteria [sic]). However, ***the Board finds***

9

> *that the veteran does not meet this criteria* [sic] *merely by showing that he is not meeting his full potential in the workplace*. Moreover, the Board acknowledges that the veteran has severe occupational impairment and a 70[%] evaluation takes such impairment into consideration.

R. at 17 (emphasis added). The Board considered the veteran's PTSD disability "in relation to its history", 38 C.F.R. § 4.1, and discussed the evidence of record in detail "from the point of view of the veteran working or seeking work", 38 C.F.R. § 4.2. *See Brown (Kevin)*, 5 Vet.App. at 420; *Schafrath*, 1 Vet.App. at 594. In view of the foregoing discussion, the Court holds that the Board complied with the *general* regulatory provisions regarding rating-reduction cases and did not err by considering nonmedical evidence when it acted to reduce the veteran's rating, which was originally assigned based on nonmedical evidence. *See Wilson (Merritte)*, *Brown (Kevin)*, and *Fugere*, all *supra*. However, our analysis does not end here.

### B. Special Protections for 100% Ratings

In certain rating-reduction cases, VA benefits recipients are to be afforded greater protections, set forth in 38 C.F.R. §§ 3.343, 3.344 (1999), than those general protections discussed in part II.A., above. For example, "it is clear that the requirements for *decrease* of a disability rating for disabilities which have continued for long periods of time at the same level are more stringent than those for an initial award or an increase in ratings". *Olson v. Brown*, 5 Vet.App. 430, 433-34 (1993) (citing *Collier v. Derwinski*, 2 Vet.App. 247, 249 (1992)); *see also Tucker v. Derwinski*, 2 Vet.App. 201, 203 (1992) (Steinberg, J., concurring) ("VA regulations require that special standards apply to reductions of 100% ratings" (citing 38 C.F.R. §§ 3.343(a), 3.344(a), (c)).

*1. 38 C.F.R. § 3.344.* The appellant asserts that his 100% PTSD rating was protected under 38 C.F.R. § 3.344(a) and (b), which provide generally that certain steps and special care must be taken before VA reduces disability ratings in certain specified instances. *See* Br. at 4. However, subsection *(c)* of § 3.344, not addressed by the appellant, provides in pertinent part:

> (c) *Disabilities which are likely to improve.* The provisions of paragraphs (a) and (b) of this section apply to ratings which have continued for long periods at the same level (5 years or more).

38 C.F.R. § 3.344(c). In this case, the veteran's 100% PTSD rating was assigned in August 1993 and was made effective as of October 1991. R. at 494. The reduction occurred in March 1996 and was made effective as of June 1996. R. at 676; *see Brown (Kevin)*, 5 Vet.App. at 417 (holding that five-

year period in § 3.344(c) is to be measured from effective date of rating not from date of RO decision assigning that rating). Hence, as the Board correctly found (R. at 13) and the Secretary points out in his motion (Motion at 17, 25-26), the veteran's 100% rating had been in effect from October 1991 to June 1996, a period of four years and eight months, four months short of the five years referred to in the regulation. This Court held in *Lehman v. Derwinski* that the "five[-]year time frame [set forth in 38 C.F.R. § 3.344(c)] is merely a guideline, not a mandate". *Lehman*, 1 Vet.App. 339, 342 (1991) (holding that five-year requirement did not bar applicability of § 3.344(a) and (b) in case where "appellant's rating ha[d] been in existence . . . for four years and either 363 or 364 days"). However, we have also held that *Lehman* was limited to "'the particularly compelling facts of that case' . . . [and] did not warrant a conclusion that the five-year provision was satisfied by a rating that had been in effect . . . for four years [and] ten months". *Brown (Kevin), supra* (quoting and discussing *Smith (Raymond) v. Brown*, 5 Vet.App. 335, 339 (1993)). The circumstances of the instant case more closely resemble those in *Brown (Kevin), supra*, where a rating had been in effect for a period of four years and ten months, which is two months longer than the veteran's PTSD rating had been in effect in the instant case, than they resemble those in *Lehman*, where the rating was in effect for the full five years less a day or two. Accordingly, we hold here, on de novo review, that the BVA's conclusion that the veteran does not meet the threshold requirement of § 3.344(c) -- and is thus not protected by § 3.344(a) or (b) (R. at 13) -- was correct.

*2. 38 C.F.R. § 3.343*. Additional procedural protections for total disability ratings are set forth in 38 C.F.R. § 3.343, which provides:

> (a) *General*. **Total disability ratings**, when warranted by the severity of the condition and **not granted purely because of** hospital, surgical, or home treatment, or **individual unemployability will not be reduced, in the absence of clear error, without examination showing material improvement in physical or mental condition.** Examination reports showing material improvement must be evaluated in conjunction with all the facts of record, and consideration must be given particularly to whether the veteran attained improvement under the ordinary conditions of life, i.e., while working or actively seeking work or whether the symptoms have been brought under control by prolonged rest, or generally, by following a regimen which precludes work, and, if the latter, reduction from total disability ratings will not be considered pending reexamination after a period of employment (3 to 6 months).

11

. . . .

(c) *Individual unemployability*. (1) In reducing a rating of 100 percent service-connected disability ***based on individual unemployability***, the provisions of § 3.105(e) are for application but caution must be exercised in such a determination that ***actual employability is established by clear and convincing evidence****.* . . .

(2) If a veteran with a total disability rating for compensation purposes based on individual unemployability begins to engage in a substantially gainful occupation during the period beginning after January 1, 1985, ***the veteran's rating may not be reduced solely on the basis of having secured and followed such substantially gainful occupation unless the veteran maintains the occupation for a period of 12 consecutive months.*** For purposes of this subparagraph, temporary interruptions in employment which are of short duration shall not be considered breaks in otherwise continuous employment.

38 C.F.R. § 3.343(a), (c) (emphasis added).

According to the language of the regulation, paragraph (a) of § 3.343 would apply to a veteran who has received a "[t]otal disability rating . . . based on the severity of the condition and not granted purely because of . . . individual unemployability", whereas paragraph (c) would apply to a veteran who has received a total rating "based on individual unemployability", although perhaps not based ***purely*** on such unemployability. It is conceivable, then, that ***both*** paragraph (a) and (c) could apply in a case where a veteran's 100% rating had been based in part on individual unemployability and also in part on the severity of the rated condition.

In this case, the basis of the veteran's 100% rating is unclear. The August 1993 RO decision (R. at 494) and July 1993 hearing officer's decision (R. at 489) both cited to 38 C.F.R. § 4.16(c) as the basis for the 100% rating then assigned. That regulation, which "was deleted effective November 7, 1996", *Norris (Robert) v. West*, 12 Vet.App. 413, 418 (1999) (citing 61 Fed. Reg. 52,695, 52,699 (1996)), had provided that certain mental disorders that "preclude[d] a veteran from securing or following a substantially gainful occupation . . . . shall be assigned a ***100 percent schedular evaluation*** under the appropriate diagnostic code." 38 C.F.R. § 4.16(c) (1996) (emphasis added). The emphasized language appears to mean that a rating assigned pursuant to § 4.16(c) was schedular in nature. However, in *Johnson (Gary) v. Brown*, the Court held that it was "reasonable" for the Secretary to interpret § 4.16(c) as a "procedural device" that, in essence, made a 100% schedular rating applicable to a veteran whose sole disability was a mental disorder that rendered him

12

unemployable. *Johnson (Gary)*, 7 Vet.App. 95, 97, 99 (1994). In this respect, then, it would appear that the 100% rating awarded pursuant to § 4.16(c) was one based on individual unemployability. Hence, the basis for the veteran's 100% rating in this case is unclear and, therefore, it is not clear whether the Board should have considered the application of paragraph (a) of § 3.343 (which applies to a total rating "not granted purely because of . . . individual unemployability), or of paragraph (c) of § 3.343 (which applies to 100% ratings "based on individual unemployability").

It *is* clear, however, that the Board should have discussed the application of at least one of those paragraphs and that it failed to discuss either. *Cf.* R. at 12 (reiterating the contents of, but not applying, paragraph (a) of § 3.343). In view of that failure, we would generally reverse the Board's decision and remand the matter to the Board for it to reinstate the veteran's rating. *See Dofflemyer v. Derwinski*, 2 Vet.App. 277, 282 (1992) (holding that BVA rating reduction that failed to consider 38 C.F.R. §§ 3.343(a) and 3.344(a) was void ab initio). However, we are required by statute first to consider the application of the rule of prejudicial error. *See* 38 U.S.C. § 7261(b) (Court shall take due account of rule of prejudicial error); *Edenfield v. Brown*, 8 Vet.App. 384, 390-91 (1995) (en banc). For the purpose of undertaking such consideration of prejudice to the appellant, we will analyze this appeal under both paragraphs (a) and (c) of § 3.343, assuming for that purpose that either paragraph or both paragraphs may have applied to this appeal.

*a. 38 C.F.R. § 3.343(a)***:** The Board reiterated the provisions of 38 C.F.R. § 3.343(a) on the first page of the "[l]egal [a]nalysis" section of its decision. R. at 12. Although the Board did not cite to that provision at any other place in its decision, it did include the following paragraph:

> The Board notes that the medical evidence of record at the time of the March 1996 rating reduction did not indicate a change in the veteran's symptomatology; however . . . , the veteran's total evaluation was not based on medical evidence originally, but on evidence that the veteran was incapable of supporting himself as a result of his PTSD. However, the medical evidence of record at the time of the March 1996 determination indicated that the veteran had a high salary (September 1994 [Social and Industrial] survey [(R. at 570)]), reported more income and was able to support himself better (April 1995 VA examination [(R. at 578)]), and made $36,000 in 1994 (August 1995 VA examination [(R. at 622)]). Accordingly, these examination reports reflected ***material improvement in the veteran's condition.***

R. at 16 (emphasis added). The requirement of "examination[s] showing material improvement" is set forth in § 3.343(a) and, therefore, the Board did make a finding in accordance with the terms of

13

that regulation, albeit without citation or specific reference thereto, and the Court finds a plausible basis in the record for that finding. In this case, the August 1995 VA PTSD examination report indicated that the veteran had earned $36,000 in 1994 (R. at 622), an amount well in excess of the $675 that he had earned in 1991 (R. at 456-57). In addition, a VA examination report from April 1995 recognized as a "significant change for the better that the patient is . . . making more money and [is] able to support himself a little better". R. at 579. As we concluded regarding the general rating-reduction provisions discussed in part II.A., above, there is nothing in § 3.343(a) that requires that the "material improvement" discussed therein have a medical basis -- only that the "material improvement" be reflected in "examination reports". Thus, the fact that the latter examiner was not able to "see any significant changes at th[at] time other than the increased income" (R. at 579) does not undercut the Board's finding that "these examination reports reflected material improvement in the veteran's condition" (R. at 16). Based on that finding, the Court holds that the requirements of § 3.343(a) were in fact met in this case. Hence, notwithstanding the Board's failure to discuss § 3.343(a) explicitly, the Board's decision contains findings that meet the requirements of § 3.343(a). Moreover, the Board decision is supported by a plausible basis in the record and is therefore not clearly erroneous. *See Smallwood* and *Gilbert*, both *supra*.

***b. 38 C.F.R. § 3.343(c)***: We now turn to the application of § 3.343(c), which starts by requiring the Board to comply with "the provisions of § 3.105(e)". 38 C.F.R. § 3.343(c)(1). In *Brown (Kevin)*, we summarized those requirements as follows:

> Pursuant to 38 C.F.R. § 3.105(e), when the RO determines that a rating reduction is warranted, it is required to issue a proposed rating reduction, setting forth the reasons for the proposed reduction, and to allow the veteran a period of at least 60 days to submit additional evidence to show that the rating should not be reduced. Furthermore, when, after such period, the RO issues a decision reducing the rating, that reduction does not become effective until the "[l]ast day of [the] month following 60 days after notice to [the] payee" of the reduction decision. 38 C.F.R. § 3.400(r) (199[8]); *see* 38 C.F.R. § 3.105(e).
>
> The effect of §§ 3.105(e) and 3.400(r) combined is that a rating reduction cannot be made effective for a minimum of 120 days after it is proposed in writing to the veteran.

*Brown (Kevin)*, 5 Vet.App. at 418.

In this case, the RO proposed in September 1995 that the veteran's rating be decreased from

14

100% to 70%. R. at 628. The RO decision effectuating that reduction was not issued until March 1996 (R. at 676), well over "60 days" after the September 1995 RO decision (38 C.F.R. § 3.105(e)), and the reduction was made only after a hearing was held before the RO in February 1996 (R. at 655-71). Hence, the veteran was provided with at least 60 days' advance notice of the rating reduction and with the opportunity to be heard at a hearing regarding that reduction, as required by the reference to 38 C.F.R. § 3.105(e) in § 3.343(c). Moreover, the effective date of the reduction was June 1996 (R. at 676), well over 120 days after the reduction had been "proposed in writing to the veteran." *Brown (Kevin), supra.* Thus, the Court holds that the requirements of § 3.105(e) were met in this case.

In addition to requiring that the Board comply with § 3.105(e), the provisions of § 3.343(c)(1) require that in reducing a veteran's rating the Board exercise "caution . . . that actual employability is established by ***clear and convincing evidence***." In this case, the fact of the veteran's actual employ***ment*** has not been disputed and he himself has provided VA with evidence of that employment. *See, e.g.,* R. at 585 (veteran's May 1995 sworn testimony that he earned a salary of $3,000/month). However, for the purposes of the reduction of a TDIU rating, actual employ***ment*** is not synonymous with actual employ***ability***, because a TDIU rating such as was awarded here (i.e., a 100% rating awarded based on 38 C.F.R. § 4.16) considers more than simply whether the claimant can or cannot work at all. Therefore, a finding of "actual employability" under § 3.343(c)(1), as in this case, must encompass a finding that the veteran is no longer unemployable -- that is, is no longer "unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities" -- under 38 C.F.R. § 4.16(a) (1999).

Similarly, 38 C.F.R. § 3.343(c)(***2***) requires that when "a veteran with a total disability rating for compensation purposes ***based on individual unemployability*** begins to engage in a substantially gainful occupation during the period beginning after January 1, 1985, ***the veteran's rating may not be reduced solely on the basis of having secured and followed such substantially gainful occupation unless the veteran maintains the occupation for a period of 12 consecutive months."*** 38 C.F.R. § 3.343(c)(2) (emphasis added). When read ***together***, then, as to a post-January 1, 1985, reduction of a 100% rating based on individual unemployability, subparagraphs (1) and (2) of § 3.343(c) mandate that (1) a 100% rating may be reduced only when "clear and convincing

evidence" shows the veteran's "actual employability" for a position that constitutes a "substantially gainful occupation", and (2) such reduction may not be made based ***solely*** on the veteran's having "secured and followed such substantially gainful occupation unless the veteran maintains the occupation for a period of 12 consecutive months" (disregarding any "temporary interruptions in employment which are of short duration").  38 C.F.R. § 3.343(c)(1), (2).

In order to determine whether in this case there is clear and convincing evidence under § 3.343(c)(1) that the veteran was actually employable at a substantially gainful occupation, we must define the term "substantially gainful occupation".  Section § 3.343 itself does not define the term.  However, paragraph (c) of § 3.343 applies only when there has been an underlying award of a total rating "based on individual employability", i.e., based on § 4.16.  Hence, we look to § 4.16 for a definition of a "substantially gainful occupation" under § 3.343(c); that regulation provides in paragraph (a) that "[m]arginal employment shall not be considered substantially gainful employment", and that "marginal employment generally shall be deemed to exist when a veteran's earned annual income does not exceed the amount established by the U.S. Department of Commerce, Bureau of the Census, as the poverty threshold for one person."  38 C.F.R. § 4.16(a).  (Neither paragraph (b) nor former paragraph (c) of § 4.16 contains any information pertinent to an inquiry as to the meaning of the terms "employability" or "substantially gainful occupation" under § 3.343 as applied to TDIU rating-reduction cases.)

Although § 4.16(a) does not define specifically what substantially gainful employment is, it does provide that "marginal employment" is ***not*** substantially gainful employment and thus implies that employment that is more than marginal may be considered to be "substantially gainful employment".  In *Moore (Robert) v. Derwinski*, the Court recognized the need for a clear definition of unemployability but was, at that time, "not yet prepared to impose a Court-created rule on the BVA".  *Moore (Robert)*, 1 Vet.App. 356, 359 (1991); *see also id.* at 358 (stating that, for the purposes of § 4.16(a), "[s]ubstantially gainful employment . . . . suggests a living wage"); *Beaty v. Brown*, 6 Vet.App. 532, 538 (1994) (citing *Moore (Robert)*).  Nevertheless, in *Moore (Robert), supra*, we "suggest[ed] to the Secretary that there is much that could be borrowed from [opinions of other federal courts regarding] . . . whether a social security disability claimant is able to engage in a 'substantial gainful activity'".  *Cf. Ferraro v. Derwinski*, 1 Vet.App. 326, 332-33 (1991)

16

(discussing possible definitions of substantially gainful employment including nonmarginal employment but concluding that disposing of that case did "not require that we adopt a definition of 'substantially gainful employment'"). In view of the fact that the Secretary has yet to issue a clear definition of substantially gainful employment, despite the Court's encouragement to that effect provided in *Moore (Robert)* almost a decade ago, today we articulate such a definition for the purpose of dealing with the facts of this case.

We first consider the "amount established by the U.S. Department of Commerce, Bureau of the Census, as the poverty threshold for one person". 38 C.F.R. § 4.16(a). According to current statistics provided by the U.S. Department of Commerce, Bureau of the Census, the poverty threshold for one person under the age of 65 in 1993, at the time when the veteran was first assigned a 100% rating, was $7,518/year. *See* U.S. Department of Commerce, Bureau of the Census, *Current Population Survey, Poverty Thresholds: 1999* (last modified Jan. 27, 2000) <http://www.census.gov/hhes/poverty/threshld/thresh93.html>. In this case, although the veteran had been earning only $675/year in 1991 (R. at 456), evidence submitted following the August 1993 RO decision showed him earning $48,000 in 1993 (R. at 504-40, 554) and $36,000 in 1994 (R. at 622, 657), well in excess of the poverty threshold for one person. Hence, the veteran was at least not ***marginally*** employed. In addition, we note that a determination whether a person is capable of engaging in a substantially gainful occupation must consider both that person's abilities and his employment history. *See Gleicher v. Derwinski*, 2 Vet.App. 26, 28 (1991). In this case, the veteran has been employed in the same occupation since at least 1987, albeit that he is making less money now than he did then. R. at 456-57 (veteran's April 1993 sworn testimony that in 1987 he had earned $52,000 and in 1994 he had earned $36,000).

Moreover, we find appropriate guidance in -- albeit that we are not bound by -- the definition of "substantially gainful activity" provided in regulations promulgated by the Social Security Administration (SSA). *See Murincsak v. Derwinski*, 2 Vet.App. 363, 370-71 (1992) (comparing the use of terms "substantially" and "gainful" contained in VA regulations with the use of the same terms in SSA regulations); *Moore (Robert), supra* (suggesting that Secretary refer to SSA caselaw for definition of unemployability); *cf. Beaty*, 6 Vet.App. at 538 (noting that ***VA*** cannot "in certain cases choose to apply SSA regulations that have never been adopted by the Secretary [of Veterans Affairs]

17

as applicable to VA claims adjudication" while "not adopt[ing] certain [other] SSA regulations that would generally be beneficial to a claimant"). Under SSA regulations, "[s]ubstantially gainful activity" is defined as "work that -- (a) [i]nvolves doing significant productive physical or mental duties; and (b) [i]s done . . . for pay or profit." 20 C.F.R. § 404.1509 (1999). On this record, the exact nature of the veteran's day-to-day work activities is unclear; however, it is not disputed that he runs his own business managing pension investments. R. at 842. He is responsible for hiring employees (*ibid.*) and meets individually at least four times per year with each of his "20 investment clients" (R. at 843). In the context of the entire SSA regulatory concept of "substantially gainful activity", it appears that the fact that a person believes that he should be earning "$100,000" and that he is not able to work a 40-hour workweek (R. at 660-61) would not render him incapable of engaging in substantially gainful activity, because those SSA regulations clearly provide that "work may be substantial even if it is done on a part-time basis or if [a claimant is] . . . paid less, or [is given] . . . less responsibility than when [the same claimant] worked before." 20 C.F.R. § 404.1572(a) (1999).

In view of § 4.16(a) and of the guidance set forth in the Court's precedents and drawing a helpful but not binding or determinative analogy from the full context of the SSA regulations discussed above, the Court holds that where, as in this case, the veteran became employed, as shown by clear and convincing evidence, at a substantially gainful occupation -- i.e., one that provides annual income that exceeds the poverty threshold for one person, irrespective of the number of hours or days that the veteran actually works and without regard to the veteran's earned annual income prior to his having been awarded a 100% rating based on individual unemployability -- such employment constitutes, as a matter of law, a substantially gainful occupation and thus "actual employability" for the purposes of 38 C.F.R. § 3.343(c)(1). *See Murincsak*, *Gleicher*, *Moore (Robert)*, and *Ferraro*, all *supra*.

As to the requirement under § 3.343(c)(2) that the veteran have "maintain[ed]" such substantially gainful occupation "for a period of 12 consecutive months" (disregarding any "temporary interruptions in employment which are of short duration"), the veteran has testified under oath that he has been selling insurance and investments since 1985, and appears to have done so without any significant interruption since at least 1991. R. at 456. There is no indication that he has,

in the twelve months prior to the effective date of his reduced rating, experienced any interruption in his employment, nor does he argue to this Court that any such interruptions have occurred.

Hence, the Court holds, as a matter of law, that even if § 3.343(c) applies to this veteran (that is, because the veteran's 100% rating may have been based in part on individual unemployability and also in part on the severity of his rated condition), the evidence *overwhelmingly* shows that that regulation, just as was the case with § 3.343(a), affords him no protection for his 100% rating. Therefore, the Board's failure to provide an adequate discussion of § 3.343(c) could not have been prejudicial to this appellant. *See* 38 U.S.C. § 7261(b); *Edenfield* and *Soyini*, both *supra*; *see also Wilson (Merritte)*, *Brown (Kevin)*, and *Fugere*, all *supra.*

### C. Reduction of Rating from 100% to 70%

It is not clear, based on the pleadings presented to the Court, that the appellant challenges the Board's factual predicate, as distinguished from the Board's compliance with the legal protections afforded to existing ratings under the applicable VA regulations, for making the rating reduction in this case. In any event, the Court finds a plausible basis in the record for the Board's determinations that the veteran had originally been evaluated as 100% disabled based on nonmedical criteria and that he no longer meets those nonmedical criteria, and thus, in light of the legal conclusions that we reached in parts II.A. and B., above, the Court holds that the Board was not clearly erroneous in deciding to reduce, as of the date of the March 1996 RO decision, the veteran's 100% rating to 70% -- which is the next-highest rating after 100% provided for under the current and formerly applicable diagnostic codes (*see* 38 C.F.R. § 4.132, DC 9411 (1996); 38 C.F.R. § 4.130, DC 9411 (1999)). *See Smallwood* and *Gilbert*, both *supra.*

### D. BVA's Consideration of Evidence Not Made Available to Veteran

In addition to asserting that the proper procedures set forth in VA regulations were not followed in this case, the appellant asserts that the BVA improperly considered evidence that it had obtained in connection with Ms. Johnson's apportionment claim but that was not made a part of his claims file and has not at any point been provided either to him, or, for that matter, to this Court. Brief at 7-9. Regarding its consideration of information contained in Ms. Johnson's claims file, the Board stated:

The Board notes that information regarding the veteran's business and earnings was

not only contained in evidence submitted by the veteran's former spouse, but also in the veteran's own testimony at an August 1994 personal hearing before the RO. . . .

. . . [T]he Board notes that *evidence submitted regarding one claim may be considered by VA in any matter pertaining to the veteran*. . . . As this evidence is relevant to the veteran's claim, *it cannot be ignored.*

R. at 18 (emphasis added). Based on our review of the BVA decision, it appears to the Court that all of the evidence actually discussed by the Board in support of its decision in this matter -- i.e., that the veteran had earned $675 in 1991, $48,000 in 1993, and either $36,000 or $38,000 in 1994 -- was provided by the veteran himself at VA hearings and medical examinations and in connection with a September 1994 VA social and industrial survey. *See* R. at 456-57, 554, 570, 596-12, 622. Because this evidence was clearly available from sources other than Ms. Johnson's claims file, the Board's statement that that claims file "cannot be ignored" (R. at 18) is, on its face, simply not true.

Moreover, as a general matter, VA should not consider in its decisions any evidence not made available to the claimant. Several provisions of title 38 of the U.S. Code require VA to disclose to a claimant and/or to summarize the contents of the evidence relevant to his own case. 38 U.S.C. §§ 5104(b) ("[i]n any case where the Secretary denies a benefit sought, [he shall provide] . . . a summary of the evidence considered by the Secretary"), 5701 (requiring release to claimant of VA records contained in claimant's own claims file), 7015(d)(1)(A) (requiring RO to include in SOC "[a] summary of the evidence in the case pertinent to the issue or issues with which the disagreement has been expressed"); *see also Anderson (Hersey) v. West*, 12 Vet.App. 491, 493-95 (1999) (discussing Secretary's obligation to provide to claimants copies of documents in custody of VA); *Sutton v. Brown*, 9 Vet.App. 553, 564 (1996) ("before the BVA relies on any evidence developed or obtained by it subsequent to the issuance of the most recent Statement of the Case (SOC) or Supplemental SOC . . . , the BVA must provide the claimant with reasonable notice of such evidence and of the reliance that the Board proposes to place on it and provide a reasonable opportunity for the claimant to respond to it" (citing *Thurber*, *infra*)); *Hayre v. West*, 188 F.3d 1327 (Fed. Cir. 1999) ("if the claimant is to appeal effectively his or her case, the claimant must be cognizant of all the evidence considered by the [RO]" (dictum)); *cf. Wilhoite v. West*, 11 Vet.App. 251, 252 (1998) (per curiam order) (where "relevant" documents relating to veteran's claim were within Secretary's control prior to BVA decision on appeal and could reasonably have been expected to be part of ROA, such

20

documents are "in contemplation of law" constructively part of the record of those proceedings (citing *Simington v. Brown*, 9 Vet.App. 334, 335 (1996) (per curiam order) (quoting *Bell v. Derwinski*, 2 Vet.App. 611, 612-13 (1992) (per curiam order)), and *Hulsey v. Principi*, 3 Vet.App. 486, 487 (1992) (per curiam order))); *Austin v. Brown*, 6 Vet.App. 547, 550-52 (1994) (noting that although BVA may "be authorized to develop and consider certain new evidence", it must do so with regard to fair process); *Thurber v. Brown*, 5 Vet.App. 119, 122-24 (1993) (emphasizing importance to "fair process" of opportunity to be heard regarding evidence considered in adjudication of veteran's claim).

As to the inclusion in the ROA of evidence relied upon by the Board, that is, the provision *to this Court* of such evidence (as opposed to the provision of that evidence to the veteran during the course of the administrative proceedings below), the Secretary is obliged by a standing order of this Court to, "in all . . . proceedings before the Court, transmit without further order of the Court . . . all records and other materials that are not subject to the protection of 38 U.S.C. § 4132 [(not applicable to this case)] and which are required to be transmitted pursuant to [this Court's Rules of Practice and Procedure]". *In re Motion for Standing Order*, 1 Vet.App. 555, 560 (1990); *see also* U.S. VET. APP. R. 10(a) ("[w]ithin 60 days after the date of the Clerk's Notice of Docketing, the Secretary shall file with the Clerk and serve on the appellant a designation of all material in the record of proceedings before the Secretary and the Board that was *relied upon by the Board* in ruling against the appellant on the issues listed by the Board and any other material from the record which the Secretary considers relevant" (emphasis added)).

Notwithstanding our disapproval of the Board's insistence that it could not "ignore[ ]" evidence contained in Ms. Johnson's claims file that may not have been provided to the veteran in this case, especially when it appears that the evidence required to adjudicate this claim was actually provided to VA by the veteran himself, and notwithstanding as well the fact that the Secretary is required to provide to this Court copies of any evidence relied upon by the Board based on *In re Standing Order, supra*, and this Court's Rules of Practice and Procedure, we will not vacate the Board's decision on this basis for several reasons.

First, regarding any possible violation by the Secretary of *In re Standing Order, supra*, the Court notes that the ROA in this case *does* in fact contain copies of Ms. Johnson's original claim for

apportionment as well as several documents that appear to have been submitted to VA in connection with that claim. R. at 500-22. Thus, as a factual matter, it appears that at least some information from Ms. Johnson's claims file is in fact included in the ROA filed by the Secretary in this case and thus that the Secretary may not in fact have acted in violation of the Court's *Standing Order*.

As to the appellant's complaints that he was not provided with copies of documents contained in Ms. Johnson's claims file during VA's adjudication below of the claim here involved, we note first that the ROA is unclear as to whether Ms. Johnson's May 1994 statement (R. at 500-22) was provided to the veteran prior to its inclusion in the ROA before this Court. However, even if those documents were not provided to the veteran prior to their inclusion in the ROA, the veteran was notified on at least four separate occasions of his right to appeal to VA's OGC the VSO's decision not to provide him with copies of such evidence, and the veteran apparently never brought such an appeal. R. at 560, 617, 651, 691. His failure to exhaust available administrative remedies by bringing such an appeal of the VSO's determination is dispositive of his contention to this Court that the Board improperly relied on that evidence. *See Herzog v. Derwinski*, 2 Vet.App. 502, 503 (1992) ("an appellant ordinarily must exhaust all administrative remedies before an application for review can be accepted by a court"); *see also Ledford v. West*, 136 F.3d 776, 781 (Fed. Cir. 1998) (stressing importance of raising arguments to BVA pursuant to "doctrine of exhaustion of administrative remedies").

Moreover, because, as discussed above, it appears to the Court that the evidence relied upon by the Board -- i.e., the veteran's income in 1993 and 1994 -- had been provided to VA by the veteran himself on several different occasions (R. at 554, 570, 596-612, 622, 657), it is unclear to the Court how he can now claim to be prejudiced by the Board's consideration of evidence in Ms. Johnson's claims file showing the same such income. *See* 38 U.S.C. § 7261(b) (Court shall take due account of rule of prejudicial error); *Edenfield, supra*.

In view of the lack of any apparent basis for prejudice to the appellant here as well as his apparent failure to exhaust his administrative remedies, and in view of the ***overwhelming*** evidence contained in the ROA regarding the veteran's income that, as a matter of law, justified the reduction of his rating from 100% to 70%, the Court rejects this argument by the appellant for vacating the BVA decision on appeal. *See Winters v. West*, 12 Vet.App. 203 (1999) (en banc) ("even where the

22

Court concludes that an error has been committed, it need not -- indeed *must* not -- vacate or reverse the BVA decision if *it is clear* that the claimant would have been unsuccessful irrespective of the error" (citing *Soyini, supra*)); *Edenfield, supra*.

### III. Conclusion

Upon consideration of the foregoing analysis, the ROA, and the parties' pleadings, the Court holds that the appellant has not demonstrated that the BVA committed error -- in its findings of fact, conclusions of law, procedural processes, articulation of reasons or bases, or consideration of the benefit-of-the-doubt rule -- that would warrant reversal or remand under 38 U.S.C. §§ 1110, 5107(a), 7104(a) or (d)(1), or 7261, 38 C.F.R. § 4.132, DC 9411 (1996), or 38 C.F.R. §§ 3.105(e), 3.343, 3.344, 4.1, 4.2, 4.10, or 4.130, DC 9411 (1999). Therefore, the Court affirms the October 28, 1997, BVA decision. The parties' motions for single-judge disposition are denied.

AFFIRMED.