Citation Nr: 1331555 
Decision Date: 09/30/13 Archive Date: 10/02/13

DOCKET NO. 06-16 358 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Detroit, Michigan


THE ISSUE

Entitlement to a total disability rating based on individual unemployability due to service-connected disabilities (TDIU) for the period prior to May 1, 2008. 


REPRESENTATION

Appellant represented by: Disabled American Veterans


ATTORNEY FOR THE BOARD

D. Schechter, Counsel 



INTRODUCTION

The Veteran served on active military duty from June 1960 to June 1972. 

The appeal comes before the Board of Veterans' Appeals (Board) from a November 2005 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) in Detroit, Michigan. 

The Board in December 2010, August 2012, and May 2013, remanded the appealed claim for further development, and it now returns to the Board for additional review. Over the course of claim and appeal, other issues were resolved by the RO, the Board, or the Appeals Management Center (AMC), and these do not remain as cases in controversy for appellate consideration by the Board. 


FINDING OF FACT

Prior to May 1, 2008, the Veteran met the schedular criteria for TDIU. However, the preponderance of the competent and credible evidence of record does not show that, prior to May 1, 2008, service-connected disabilities alone precluded the Veteran from substantially gainful employment. 


CONCLUSION OF LAW

The criteria for a TDIU prior to May 1, 2008 have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2002); 38 C.F.R. §§ 3.340, 3.341, 4.15, 4.16 (2013).



REASONS AND BASES FOR FINDING AND CONCLUSION

I. Duties to Notify and Assist

The Veterans Claims Assistance Act of 2000 (VCAA) enhanced VA's duty to notify and assist claimants in substantiating their claim for VA benefits, as codified in pertinent part at 38 U.S.C.A. §§ 5103 , 5103A, 5107, 5126 (West 2002 & Supp. 2013); 38 C.F.R. §§ 3.102 , 3.159, 3.326(a) (2013).

Upon receipt of a complete or substantially complete application for benefits, VA is required to notify the claimant and his representative of any information, and any medical or lay evidence, that is necessary to substantiate the claim. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b); Quartuccio v. Principi, 16 Vet. App. 183 (2002). Proper notice from VA must inform the claimant of any information and evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; and (3) that the claimant is expected to provide. This notice must be provided prior to an initial decision on a claim by the RO. Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006); Pelegrini v. Principi, 18 Vet. App. 112 (2004). 

The VCAA notice requirements apply to all five elements of a service connection claim: (1) veteran status; (2) existence of disability; (3) connection between service and the disability; (4) degree of disability; and (5) effective date of benefits where a claim is granted. Dingess v. Nicholson, 19 Vet. App. 473, 484 (2006).

If complete notice is not provided until after the initial adjudication, such a timing error can be cured by subsequent legally adequate VCAA notice, followed by readjudication of the claim, as in a statement of the case (SOC) or supplemental SOC (SSOC). Moreover, where there is an uncured timing defect in the notice, subsequent action by the RO which provides the claimant a meaningful opportunity to participate in the processing of the claim can prevent any such defect from being prejudicial. Mayfield v. Nicholson, 499 F.3d 1317, 1323-24 (Fed. Cir. 2007); Prickett v. Nicholson, 20 Vet. App. 370, 376 (2006).

In a letter dated in November 2006, the RO informed the Veteran of its duty to assist him in substantiating his claim for TDIU and the effect of this duty upon his claim. This letter also informed him of how disability ratings and effective dates are assigned. See Dingess, 19 Vet. App. at 484. 

Moreover, the Board finds that VA has also fulfilled its duty to assist the Veteran in developing his claim. The Veteran's service treatment records, VA medical records, Social Security Administration (SSA) records, and a number of private treatment records are in the file. The Veteran has not identified any other outstanding records that have yet to be requested in furtherance of his claim, and all records received have been appropriately associated with the Veteran's claims file or his Virtual VA electronic claims file. 

Appropriate examinations have also been obtained addressing the claim, including most recently in June 2013, as discussed below. The Board finds that the VA examinations are adequate, as the examiners, taken as a whole, reviewed the claims file, interviewed and examined the Veteran, and described the Veteran's disabilities including in the period prior to May 1, 2008, in sufficient detail to enable the Board to make a fully informed decision on this claim. See Stefl v. Nicholson, 21 Vet. App. 120, 123 (2007); Barr v. Nicholson, 21 Vet. App. 303, 312 (2007). Moreover, there is no indication that further examination or opinion is warranted to determine whether the criteria have been met for a TDIU. 

Thus, the Board concludes that no further notice or assistance to the Veteran is required to fulfill VA's duty to assist him in the development of his claim for a TDIU. No useful purpose would be served in remanding this matter for yet more development. A remand would result in unnecessarily imposing additional burdens on VA, with no additional benefit to the Veteran. Smith v. Gober, 14 Vet. App. 227 (2000), aff'd 281 F.3d 1384 (Fed. Cir. 2002); Dela Cruz v. Principi, 15 Vet. App. 143 (2001).

The Board also finds that development requested by the Board's prior remands in December 2010, August 2012, and May 2013 have been substantially fulfilled. Stegall v. West, 11 Vet. App. 268 (1998); D'Aries v. Peake, 22 Vet. App. 97 (2008). This included affording additional notice or assistance to the Veteran, requesting indicated records, and obtaining examination opinions addressing impacts of service-connected disabilities on the Veteran's employability prior to May 2008, all followed by RO or AMC readjudication of the claim. 

II. Analysis

A TDIU claim is one for increased compensation, and the effective date rules for increased compensation therefore apply to a TDIU claim. See Rice v. Shinseki, 22 Vet. App. 447, 454 (2009); Hurd v. West, 13 Vet. App. 449 (2000). 

In this case, the Veteran submitted his formal claim for TDIU in May 2006. However, this was during the pendency of his claims for service connection for bilateral hearing loss and tinnitus, and thus the TDIU may be considered in the nature of a claim for a higher initial evaluation including for hearing loss and tinnitus. See Bagwell v. Brown, 9 Vet. App. 337, 339 (1996); see also Rice, 22 Vet. App. at 545-46. That initial rating is of necessity no earlier than the date of service connection, which, for the hearing loss and tinnitus claims, was December 23, 2004. See 38 C.F.R. § 3.400 (2013). 

Whether the Veteran is entitled to TDIU prior to May 1, 2008 is based on the service-connected disabilities at the time, which include all the Veteran's service-connected disabilities: adenocarcinoma of the prostate, angina and coronary artery disease, posttraumatic stress disorder (PTSD), bilateral hearing loss, and tinnitus.

Generally, total disability will be considered to exist when there is present any impairment of mind or body that is sufficient to render it impossible for the average person to follow a substantially gainful occupation. 38 C.F.R. § 3.340 (2013). 

It is the established policy of VA that all veterans who are unable to secure and follow a substantially gainful occupation by reason of service-connected disabilities shall be rated totally disabled. 38 C.F.R. § 4.16 (2013). A finding of total disability is appropriate, "when there is present any impairment of mind or body which is sufficient to render it impossible for the average person to follow a substantially gainful occupation." 38 C.F.R. §§ 3.340(a)(1), 4.15 (2013). 

In reaching such a determination, the central inquiry is "whether the veteran's service-connected disabilities alone are of sufficient severity to produce unemployability." Hatlestad v. Brown, 5 Vet. App. 524, 529 (1993). Consideration may not be given to the impairment caused by non service-connected disabilities. See 38 C.F.R. §§ 3.341, 4.16, 4.19 (2013). 

"Substantially gainful employment" is that employment "which is ordinarily followed by the nondisabled to earn their livelihood with earnings common to the particular occupation in the community where the veteran resides." Moore v. Derwinski, 1 Vet. App. 356, 358 (1991). Marginal employment is not considered substantially gainful employment. 38 C.F.R. § 4.16(a). In Faust v. West, 13 Vet. App. 342 (2000), the United States Court of Appeals for Veterans Claims (Court) defined "substantially gainful employment" as an occupation that provides an annual income that exceeds the poverty threshold for one person, irrespective of the number of hours or days that a veteran actually works and without regard to a veteran's earned annual income.

A claim for a total disability rating based upon individual unemployability, "presupposes that the rating for the [service-connected] condition is less than 100 [percent], and only asks for TDIU because of 'subjective' factors that the 'objective' rating does not consider." Vettese v. Brown, 7 Vet App. 31 (1994). In evaluating a Veteran's employability, consideration may be given to his level of education, special training, and previous work experience in arriving at a conclusion, but not to his age or impairment caused by non service-connected disabilities. 38 C.F.R. §§ 3.341, 4.16, 4.19. 

For a veteran to prevail on a total rating claim, the record must reflect some factor that takes the claimant's case outside the norm. The sole fact that a veteran is unemployed or has difficulty finding employment is not enough, since a high rating in itself is recognition that the impairment makes it difficult to obtain and keep employment; the question is whether the claimant is capable of performing the physical and mental acts required for employment, not whether the claimant can find employment. See Van Hoose v. Brown, 4 Vet. App. 361, 363 (1993). 

Additionally, the Court has recognized that, "the effect of a service-connected disability appears to be measured differently for purposes of extra-schedular consideration under 38 C.F.R. § 3.321(b)(1) . . . [than] for purposes of a TDIU claim under 38 C.F.R. § 4.16." Kellar v. Brown, 6 Vet. App. 157, 162 (1994). While the former regulatory provision requires marked interference with employment, the latter requires evidence of unemployability. Id. Thus, section 3.321(b)(1) is not for application in a TDIU analysis.

The Veteran submitted his formal claim for TDIU in May 2006. As noted previously, this was during the pendency of his claims for service connection for bilateral hearing loss and tinnitus, and thus the TDIU may be considered in the nature of a claim for a higher initial evaluation including for hearing loss and tinnitus. As the Veteran was awarded a total rating effective May 1, 2008, he is essentially seeking TDIU prior to May 1, 2008, because he was not considered totally disabled at that time based on the schedular ratings of his service-connected disabilities. Because the Veteran was service connected for disabilities effective December 3, 2004, and was not service connection for any disabilities effective prior to that date, the TDIU benefit, as addressed in the current appeal based on presently service-connected disabilities, cannot be earlier than December 3, 2004. The Veteran has been assigned a 90 percent schedular rating effective from December 3, 2004, and hence for the entire interval from December 3, 2004, through April 30, 2008, TDIU on a schedular basis under 38 C.F.R. § 4.16(a) is for consideration.

(The hearing loss and tinnitus disabilities were service connected effective from December 23, 2004, as were the Veteran's prostate cancer and PTSD initially, but it appears that in the course of claims administrative error resulted in an effective date of December 3, 2004, for both the prostate cancer and PTSD. The TDIU claim was also arguably at issue for the higher initial rating claim for prostate cancer which had been pending when the TDIU claim was received. The Board accordingly also considers entitlement to TDIU as early as December 3, 2004. Ultimately, however, the Board determines herein that TDIU is not warranted for any time interval prior to May 1, 2008.)

A SSA rating examiner in April 2005 found that the Veteran qualified for SSA disability benefits based on disability beginning November 24, 2004, and that the primary diagnosis supporting the disability finding was an anxiety disorder, with a secondary diagnosis of ischemic hearing disease with or without angina. 

The Board has considered the fact that the Veteran has been awarded SSA disability benefits, which is evidence in support of his claim. VA is not bound by the findings of disability and or unemployability made by other agencies, including SSA. See Collier v. Derwinski, 1 Vet. App. 413, 417 (1991). Nevertheless while a SSA decision is not controlling for purposes of VA adjudication, it is pertinent to the claim. See Martin v. Brown, 4 Vet. App, 136 140 (1993); see also Murincsak v. Derwinski, 2 Vet. App 363 372 (1992) (VA's duty to assist includes obtaining records form the SSA and giving appropriate consideration and weight to such evidence; such evidence is not necessary dispositive of a Veteran's clam, but it is evidence which must be considered). The SSA considered the Veteran's age, which VA is prohibited from doing. Additionally, SSA medical records relied upon evidence of substantial respiratory impairment, including chronic obstructive pulmonary disease (COPD), whereas the Veteran is not service connected for any respiratory disorder, and hence his respiratory disorders may not be relied upon to support the TDIU claim. 38 C.F.R. § 4.16. Thus, SSA's decision that the Veteran has been unable to work since November 24, 2004, is not, in and of itself, determinative of the issue before the Board as it is not based on an identical analysis.

The Board observes that the SSA determination and the records received from SSA reflect that limited records from a Vet Center, including particularly a Vet Center psychosocial assessment dated in January 2005, were used to ascertain the level of psychiatric impairment, without pertinent non-Vet Center-VA psychiatric evaluation records for review. Further, the January 2005 psychosocial evaluation used by SSA appears to reflect a greater degree of psychiatric impairment than was found upon VA psychiatric evaluation for compensation purposes in February 2006, and the January 2005 Vet Center findings appear inconsistent with contemporaneous treatment, as discussed below. 

The January 2005 psychosocial assessment relied upon by SSA noted that the Veteran and his wife were present for the examination interview, and informed that they emphasized their present financial hardship due to the Veteran's medical needs. (The record reflects that the Veteran was receiving substantial medical care through private providers in addition to VA care.) The examiner noted that the Veteran's speech was low and at times appeared pressured when talking about his military experiences. The examiner asserted that there was "some evidence of obsessive/compulsive functioning in his daily routine," though the examiner did not specify what that evidence was. The examiner also assessed some evidence of loosening of associations, though not severe, as well as some tangential thinking and flight of ideas. Again, the examiner provided no examples of such loosening associations or tangential thinking. The examiner found insight and judgment to be fair. The examiner also noted that the Veteran had experienced patterns of interpersonal conflict in marriage. The examiner assigned a Global Assessment of Functioning (GAF) score of 46 and assessed that the Veteran's prognosis was poor to fair. 

The GAF rating scale is a scale reflecting the psychological, social, and occupational functioning on a hypothetical continuum of mental-health illness. See Diagnostic and Statistical Manual for Mental Disorders, Fourth Edition, of the American Psychiatric Association (DSM- IV); Richard v. Brown, 9 Vet. App. 266, 267 (1996) (citing DSM-IV). The GAF score assigned does not determine the disability rating VA assigns, however, it is one of the medical findings that may be employed in that determination, and it is highly probative, as it relates directly to the Veteran's level of impairment of social and industrial adaptability. VAOPGCPREC 10-95; Massey v. Brown, 7 Vet. App. 204, 207 (1994).

A GAF score of 51 to 60 indicates the examinee has moderate symptoms or moderate difficulty in social, occupational, or school functioning. A GAF score ranging from 41 to 50 reflect serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). See DSM- IV. 

These January 2005 psychiatric findings and conclusions differ markedly from those of a VA PTSD examination conducted in February 2006 for compensation purposes. The February 2006 examiner was to address the presence or absence of PTSD for a service connection claim, and to address whether the Veteran had psychiatric difficulty related to his service-connected prostate cancer. The Veteran provided a personal history to the February 2006 examiner, describing a difficult childhood with an abusive, alcoholic father. The Veteran's mother remarried when the Veteran was eight, and while his stepfather was also an alcoholic, the Veteran did not report abuse by his stepfather. He reported being raised in a tarpaper shack in a logging camp without plumbing or electricity. However, he got along well with his siblings and had good relationships in school. He joined the Marines after graduating from high school. 

Continuing the February 2006 interview, the Veteran reported stressor experiences in service including having to write condolence letters for deceased soldiers for the commander to sign, going through the personal belongings and mail of the dead soldiers, and often having to enter a tent with dead bodies to have the death certificates signed. He also reported having met many soldiers at base camp who subsequently died. 

At the February 2006 examination, the Veteran reported that in service following his Vietnam tour he frequently thought of his experiences in Vietnam, but he did not then find the recollections distressing or intrusive. However, once he left service he "became distressed by the persistence of traumatic thoughts." The Veteran reported that following service he worked for a telephone company for six years, and then following his divorce from his first wife he worked odd jobs for approximately five years, at saw mills, in a factory, at a ski hill, and cutting firewood. The Veteran reported that his "attitude was perceived to be a problem" at these jobs, because he was exacting and became distressed when others did things in a manner he did not believe was appropriate. He reported that he then found a job working as a skitter operator in the woods, working with other veterans, and that he kept this job for 15 years until he retired for medical reasons. (The Veteran here omitted his subsequent history of working as a guard at a casino from 1998 until July of 2004, which he did report to SSA, as noted below.) Noted medical problems included "cardiac disease, prostate cancer, arthritis, hypertension, hypercholesterolemia, inguinal hernia, erectile dysfunction, chronic obstructive pulmonary disease, hearing loss and tinnitus." He reported that he had received Social Security disability as his income from that time. 

Also at the February 2006 examination, the Veteran reported marrying his current wife in 1998, and continuing to have a close, supportive relationship. However, he reported not having friends and tending not to trust others or make close ties. He instead spent most of his time on household projects or walking. The Veteran had no history of psychological treatment, even though he did obtain the above-noted psychological evaluation in January 2005. He reportedly had a history of alcohol abuse from 1975 to 1983, but stopped without formal treatment. He denied illicit drug use. 

Distressing recollections were noted to be a difficulty, and the Veteran reported to the February 2006 examiner that he engaged in distracting activities to avoid them, though they at times occurred while he was on walks. He also reported at times eating at night to keep his mind off combat. He reported often waking up after a few hours, thinking about Vietnam. 

Objectively at the February 2006 examination, while the Veteran was hard of hearing, he nonetheless displayed good eye contact, had speech "normal in rate, tone and volume," and his thoughts were "well organized and goal directed, with no evidence of thought disorder." The examiner also found "no evidence of hallucinations, delusions, suicidal ideation or homicidal ideation." Mood did appear dysphoric and mildly anxious, and affect was consistent with mood. Cognition appeared "intact." The Veteran was noted to be experiencing "significant detachment and estrangement from others" and a reduced interest in hunting, which had been a significant pastime for him. The examiner also noted that the Veteran had significant difficulty with staying asleep, hypervigilance, and exaggerated startle response. The examiner diagnosed PTSD and assigned a GAF score of 55. 

The significant discrepancy between the GAF of 46 assigned by the Vet Center treating clinician in January 2005, and the GAF of 55 assigned by the psychiatric examiner in February 2006 appears to be based on differences in subjective perceptions of the Veteran's mental functioning, with the January 2005 clinician finding some loosening of associations, tangential thinking, and flight of ideas, whereas the February 2006 examiner found none of these to be present. Rather, the February 2006 examiner found the Veteran's thinking to be well-organized and goal directed, without evidence of a thought disorder. Speech was also not then found to be compressed, as the January 2005 clinician had perceived. The Board finds the January 2005 clinician's findings reflecting greater severity of disability to be suspect, as they included no examples or other observed supportive of the reported loosening associations, tangentiality, or flight of ideas. To the contrary, the report in January 2005 reflects a clear chronologic history which the Veteran had provided, without apparent impediment by any significant loosened associations, tangentiality, or flight of ideas. A similar clear chronologic history was obtained by the February 2006 examiner. Additionally, other treatment records contemporaneous with these examinations, for medical conditions, do not report of any communication or behavioral or psychological or cognitive difficulties of the Veteran, but rather appear to reflect the Veteran's reporting of physical symptoms and history, and his appropriate cooperation with treating medical personnel. Thus, these records support the February 2006 examiner's assessment of the Veteran's psychiatric difficulties not significantly impairing cognition or interpersonal communication, and not the findings of the January 2005 examiner.

The Board accordingly concludes that the February 2006 VA psychiatric examiner's findings and conclusions appear to be the more accurate and reliable, and hence more credible, depiction and assessment of the Veteran's service-connected psychiatric disorder during this time period. In this respect, the Board notes that it is its responsibility to weigh the evidence, including the medical evidence, and determine where to give credit and where to withhold the same and, in doing so, the Board may accept one medical opinion and reject others. Evans v. West, 12 Vet. App. 22, 30 (1998). Credibility to be assigned to evidence can be affected by inconsistent statements, internal inconsistency of statements, inconsistency with other evidence of record, facial implausibility, bad character, interest, bias, self- interest, malingering, desire for monetary gain, and witness demeanor. Caluza v. Brown, 7 Vet. App. 498, 511, 512 (1995), aff'd per curiam, 78 F.3d. 604 (Fed. Cir. 1996).

Obtained SSA records reflect that the Veteran was employed as a logging machine operator from 1984 to 1997, as a machine operator in a furniture company from 1997 to 1998, and as a guard at casino from 1998 until July of 2004. 

A SSA functional report dated in February 2005 and associated interviews with the Veteran reflect the Veteran's report that on a daily basis he arises in the morning, eats breakfast at the table, goes for a walk, comes home, and then sits around and takes a nap because he is tired all the time. The Veteran also complained of not getting enough sleep, and awakening with his legs hurting. However, he endorsed having no problems with personal care. He reported taking the dog for a walk multiple times daily, preparing meals, and doing dishes. The Veteran endorsed being able to perform all household chores. His responses regarding the length of time it took to mow his lawn were variable, once reporting it took two-and-a-half hours, and once reporting it took from one to four hours. He reported that using the snow blower took one-and-a-half hours. He reported leaving the house four to five times daily, leaving the house himself, going out whenever possible, driving and walking when going out, and going out to shop, including shopping for clothes and food. Places he regularly visited included going downtown to the grocery store or the Post Office. He reported that shopping took about an hour. 

In the SSA interviews, the Veteran also reported preparing his own complete meals daily. He was noted to be able to pay bills, count change, handle a savings account, and use a checking account. Hobbies and interests were noted to include reading, fishing, hunting, and watching television. The Veteran reported reading and watching television daily, and hunting and fishing when the weather permitted. However, he asserted that he could not hunt or fish alone anymore. Things the Veteran reportedly did with others included talking on the telephone, playing games on the computer, and chatting. Reported limitations included getting tired or sometimes having chest pains. He reportedly could not lift more than 50 pounds, and could not walk more than two-and-a-half miles before needing to stop and rest. His responses to how long he would have to stop and rest before resuming walking were variable, in one response saying he would have to rest five to ten minutes, and in another response saying he would have to rest an hour. He contrasted his current walking capacity with his former capacity, that he used to walk "forever." The Veteran was noted to finish things that he starts, such as conversations, chores, and reading, and to follow written and spoken instructions well. He was noted to have an average capacity to handle stress and changes in routine. The Veteran's only noted assistive device was a pair of eye glasses. The Veteran did endorse that he was afraid to perform activities including hunting and fishing himself now. 
 
Pursuant to the Board's May 2013 remand, VA medical examiners addressed the effects of the Veteran's service-connected disabilities on his employability, and in particular to address whether the Veteran was unemployable due to his service-connected disabilities prior to May 1, 2008. 

In June 2013, a VA audiologist assessed that prior to May 1, 2008, the Veteran's hearing loss and tinnitus did not affect employability in professions inclusive of the Veteran's past work in manual labor and as a security guard. The examiner noted that while the Veteran's audiological impairment impacted ability to follow verbal instructions and ability to interact with coworkers, the nature and degree of his disability was not such as to negatively impact these work functions. 

In June 2013, a VA psychiatrist assessed that there was no basis to conclude that the Veteran's psychiatric disorder rendered the Veteran unable to secure or follow substantially gainful employment prior to May 1, 2008. The examiner specifically concluded that neither the Veteran nor the records within the claims file indicated the presence of gross impairment of thought processes or communication, persistent delusions or hallucinations, grossly inappropriate behavior, persistent danger of hurting himself or others, intermittent inability to perform activities of daily living, inability to maintain minimal hygiene, disorientation to time or place, or severe memory impairment. The psychiatric examiner assessed that the Veteran's overall psychiatric picture was consistent with ability to be employed in loosely supervised work prior to May 1, 2008. 

Another opinion was issued in June 2013 whereby the VA examiner considered the combined impact prior to May 1, 2008, of the Veteran's service-connected adenocarcinoma of the prostate, angina and coronary artery disease, PTSD, bilateral hearing loss, and tinnitus on his ability to obtain or retain substantially gainful employment. The examiner noted that the Veteran's prostate cancer was not found to have recurred prior to May 2008. Additionally, the Veteran's cardiovascular disease was not found to have been preclusive of substantially gainful work, with mild labor or sedentary work not precluded, as supported by a METs score of 7.1 upon testing in June 2008, which was unchanged from that found upon testing in 2005. The examiner noted that with the identified METs limits, moderate or heavy manual labor would have been precluded by cardiac symptoms. The examiner further concluded that the Veteran's service-connected disabilities, taken as a whole, did not preclude sedentary or mild physical labor work for the period prior to recurrence of the Veteran's prostate cancer in May 2008. 

The Board observes that the Veteran's past work as a security guard would not be precluded by the Veteran's service-connected disabilities, as reflected by current VA examiners' assessments of the impairments and preclusions of work activities resulting from Veteran's service-connected disabilities prior to May 1, 2008. This is consistent with and supported by the weight of other evidence of record, including treatment and examination records prior to May 2008, lay statements of activities prior to that time, and reports of activities and capacities as documented in contemporaneous SSA records, as detailed above. 

While the Veteran has alleged, in effect, that he could not be substantially gainfully employed prior to May 1, 2008, the Board finds the weight of the evidence against such a contention, with the evidence rather informing of the absence of such preclusion either due to the Veteran's service-connected disabilities individually, or taken as a whole. The Veteran in his TDIU claim had asserted that he was last employed as a security officer for a casino from April 1998 to August 2004, with a substantially gainful wage indicated for that interval. The Veteran then reported 100 days of work missed from that occupation due to illness, though he did not specify the interval over which those 100 days were missed. A reply was obtained from that employer, dated in May 2006, informing that the Veteran had been employed full-time in that capacity, working 40 hours per week, and that the Veteran had missed five days of work over the prior year interval due to disability. That employer indicated that the Veteran had retired due to prostate cancer. The record does not support such a basis of retirement at that time, since recurrence of prostate cancer was not found until May 2008. The Veteran's past work experience and occupational attainment is consistent with security guard duties which the Veteran had performed up to August 2004, which were substantially gainful in nature, and which would not have been, by the weight of the evidence, precluded by the Veteran's service-connected disabilities for the interval prior to May 1, 2008. This is also consistent with the SSA functional report dated in February 2005 and associated interviews with the Veteran, wherein the Veteran reported active engagement in activities of daily living, housekeeping, physical chores, shopping, and multiple walks daily including long walks, which do not present a picture of incapacity for substantially gainful employment. 

The Board accordingly finds the weight of the evidence against entitlement to TDIU for the time period prior to May 1, 2008. See 38 C.F.R. § 4.16. The Board has considered the benefit-of-the-doubt doctrine. However, as the preponderance of the evidence is against the claim, that doctrine is not for application. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102.


ORDER

Entitlement to TDIU prior to May 1, 2008, is denied. 



____________________________________________
RYAN T. KESSEL 
Acting Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs