# United States Court of Appeals for the Federal Circuit

---

**DWIGHT L. READ,**

*Claimant-Appellant,*

v.

**ERIC K. SHINSEKI, SECRETARY OF VETERANS AFFAIRS,**

*Respondent-Appellee.*

---

2010-7100

---

Appeal from the United States Court of Appeals for Veterans Claims in case no. 07-3461, Judge Robert N. Davis.

---

Decided: June 22, 2011

---

DORIS JOHNSON HINES, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, of Washington, DC, argued for claimant-appellant. With her on the brief was RONALD L. SMITH.

SHELLEY D. WEGER, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent-appellee. With her on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director,

and MARTIN F. HOCKEY, JR. Of counsel on the brief were
MICHAEL J. TIMINSKI, Deputy Assistant General Counsel
and DANA RAFFAELLI, Attorney, United States Depart-
ment of Veterans Affairs.

---

Before NEWMAN, CLEVENGER, and LINN, *Circuit Judges*

LINN, *Circuit Judge.*

Dwight L. Read ("Read") appeals from the decision of
the United States Court of Appeals for Veterans Claims
("Veterans Court"), holding that a 2007 Board of Veter-
ans' Appeals ("Board") decision changing the situs of
Read's disability from one Muscle Group to another was
not a severance of Read's service connection in violation of
38 U.S.C. § 1159. *Read v. Shinseki*, No. 07-3461, 2009
WL 3367647 (Vet. App. Oct. 21, 2009) (Table) ("*Read*").
For the reasons set forth below, this court affirms.

BACKGROUND

During World War II, the Veteran's Administration,
now known as the Department of Veterans Affairs ("VA"),
often granted service connection for disabilities "without
properly checking records and in many instances ap-
proved service connection when it was not warranted."
*Miscellaneous Compensation Legislation: Hearing on H.R.
113 and H.R. 660 Before the Subcomm. on Compensation
and Pensions of the H. Comm. On Veterans Affairs*, 86th
Cong., 2d Sess. 2208, 2199 (Statement of H.R. 660 Author
Rep. Frank E. Smith). In 1954, the VA began a review of
over one million claims of service connected injury, in
which it increased or decreased thousands of disability
ratings and severed service connection for thousands
more. In taking remedial action, the VA severed service
connection for many veterans years after it was granted,
making it difficult or impossible to challenge the sever-
ance, especially given the passage of time and the often

incomplete nature of World War II military records then available. This left affected veterans without recourse or compensation. *Id.*

To balance the VA's need to investigate whether the grant of service connection was appropriate against the veterans' need for protection of long-standing benefits, Congress passed 38 U.S.C. § 1159, which provides that:

> Service connection for any disability or death granted under this title which has been in force for ten or more years shall not be severed . . . except upon a showing that the original grant of service connection was based on fraud or it is clearly shown from military records that the person concerned did not have the requisite service or character of discharge.

Congress intended by this statute to "merely freeze[] the determination of service connection, that is . . . the finding by the Veterans' Administration that the disability was incurred or aggravated by military service." S. Rep. No. 86-1394, at 1 (1960).

Read served in the United States Army from July 1967 to July 1969. In February 1968, Read sustained a shell fragment wound to the right thigh, which was described, during treatment, as a "through and through gunshot wound." The entry and exit wounds were sutured, but one became infected and was reopened to be cleaned. Read sustained a permanent scar as a result of the injury.

In 1995, Read sought service connection for a "right thigh gunshot wound, shrapnel wounds back of right shoulder and forehead, and PTSD [(post-traumatic stress disorder)]." On June 8, 1995, the VA regional office

("RO") granted service connection for PTSD, and for residuals related to the fragment wound to the right thigh and forehead, but denied the presence of any injury to the right shoulder. The RO assigned a 30 percent rating for PTSD and 0 percent ratings for the scarring to the right thigh and forehead. Read appealed, and his rating was increased to 10 percent under Diagnostic Code 5313 for "RESIDUALS, GUNSHOT WOUND, RIGHT THIGH."

Diagnostic Code 5313, authorized under 38 U.S.C. § 1155 as one of a series of ratings categories, is described in 38 C.F.R. § 4.73 as follows:

> Group XIII. Posterior thigh group. Hamstring complex of 2 joint muscles. (1) Biceps femoria; (2) semimembranosus; (3) semitendinosus (Function: Extension of hip and flexion of knee. Outward and inward rotation of flexed knee. Acting with rectus femoria and Sartorius (see XIV, 1, 2) synchronizing simultaneous flexion of hip and knee and extension of hip and knee by belt-over-pulley action at knee joint.

Read appealed to the Board, citing an inability "to keep up with work requirements where you have to stand & work, for long periods of time," and pain in his leg. When Read appealed to the Board, he was given an orthopedic examination by Dr. Frost on December 18, 1996. Dr. Frost noted the scar and the "pain in [Read's] inner thigh," but could not "identify any loss of muscle." He noted the following: "IMPRESSION: 1. residuals of gunshot wound, inner medial proximal thigh right." The VA maintained Read's 10 percent disability rating under Diagnostic Code 5313 for "residuals, gunshot wound, right thigh." On March 20, 2002, the VA again maintained

Read's 10 percent rating for "residuals of a gunshot wound to the right thigh." The Board affirmed.

Read appealed to the Veterans Court, asserting that "[t]he Board committed error as a matter of law when it failed to assist [Read] . . . [by failing to] provide[ him] with a medical examination that determines all of the muscle groups effected [sic] by his [gunshot wound]." The Veterans Court vacated and remanded for the VA to provide a "muscle examination that addresses specifically the nature and extent of any muscle injuries that resulted from the gunshot wound to [Read's] right thigh." *Read v. Nicholson*, No. 02-2091, slip. op. at 2 (Vet. App. Feb. 17, 2005). The Veterans Court specifically noted that "although several examinations previously have been conducted, the examination reports do not reflect specifically which muscle groups are involved in the appellant's gunshot wound residuals." *Id.*

On December 20, 2005, after a physical examination of Read's muscles, the VA examiner answered the remand order as follows: "The muscle group is group XV that is involved. It is the examiner's opinion that his impairment would be mild to moderate weakness of the right lower extremity." On December 27, 2005, the VA maintained Read's 10 percent disability rating for "residuals of gunshot wound right thigh." The VA report noted the sections of the Code of Federal Regulations relevant to muscles groups XIII, XIV, and XV, and the sections dealing with the determinations of the rating and the disability. The VA report further noted: "[t]he examiner indicates that *only* muscle group XV is involved. The examiner opines that impairment would be mild to moderate weakness of the right lower extremity." (emphasis added). The Board then remanded to the RO, requiring a formal rating decision with the appropriate Diagnostic Code selected.

In the final set of decisions that led to this appeal, the RO continued Read's 10 percent disability rating for "residuals fragment wound, right thigh." The RO noted:

> Since January 1995, date of receipt of your claim, this disability has been rated under diagnostic code 5313 for disability affecting Muscle Group XIII without medical inquiry as to specific muscle group affected by said wound in service. This diagnostic code was chosen based on your complaints, symptoms, and findings. During the course of your appeal, VA exam was conducted on 11-17-05, at which time examiner identified the specific muscle group affected as XV. . . .
>
> Muscle group affected is reported as XV. . .
>
> Formal rating action is hereby taken to properly and accurately rate your residuals fragment wound right thigh under DC 5315 rather than 5313, based on VA exam report of 11-17-05 stating actual muscle group affected by the wound in service is Muscle Group XV. . . . The rating criteria is the same whether DC 5313 or DC 5315 is used. Thus no change in benefits results.

The Board affirmed, including a fact-finding that "[t]he veteran sustained a through and through gunshot wound to the right thigh which resulted in moderate injury to Muscle Group XV." The Veterans Court also affirmed, rejecting Read's argument that the change in Diagnostic Code to represent an injury to Muscle Group XV instead of Muscle Group XIII was an impermissible severance of service connection to his disability to Muscle

Group XIII, which was protected under 38 U.S.C. § 1159. Read, 2009 WL 3367647, at *1.

## DISCUSSION

This court reviews questions of statutory and regulatory interpretation without deference. *Hogan v. Peake*, 544 F.3d 1295, 1297 (Fed. Cir. 2008). We may not review the Veterans Court's fact-finding or its application of law to fact. *Collaro v. West*, 136 F.3d 1304, 1307 (Fed. Cir. 1998) (citing 38 U.S.C. § 7292(d)(2)).

The only question on appeal is whether the "service connection" for a "disability" protected under 38 U.S.C. § 1159 is severed when the VA assigns to an injury a different Diagnostic Code than originally noted.

In *Collaro*, this court noted the "five common elements to a veteran's application for benefits: [1] status as a veteran, [2] the existence of disability, [3] a connection between the veteran's service and the disability [(i.e. service connection)], [4] the degree of the disability, and [5] the effective date of the disability." 136 F.3d at 1308.

On its face, 38 U.S.C § 1159 protects only element [3]: "*service connection* for any disability or death granted under this title which has been in force for ten or more years shall not be severed." (emphasis added). Service connection is defined as follows: "The term 'service-connected' means, with respect to disability or death, that such disability was incurred or aggravated . . . in line of duty in the active military, naval, or air service." 38 U.S.C § 101(16). The statute further defines "non-service-connected" to mean, "with respect to disability or death, that such disability was not incurred or aggravated . . . in line of duty in the active military, naval, or air service." 38 U.S.C. § 101(17). Thus, to sever service connection is to conclude that a particular disability previously determined to have been incurred in the line of duty was

incurred otherwise. The statute is not directed to element [2], "the existence of disability," *see Collaro*, 136 F.3d at 1308. Moreover, the legislative history shows a focus on the connection between the disability and the service, not on the fact of the disability. *See* S. Rep. No. 86-1394, at 1 (1960) ("[The statute] merely freezes the determination of service connection, that is to say the finding by the Veterans' Administration that the disability was incurred or aggravated by military service.").

In contrast, the Diagnostic Code scheme is most closely related to element [4], "the degree of the disability." The VA is authorized to establish Diagnostic Codes as a corollary to its authority under 38 U.S.C § 1155 to adopt a ratings schedule. "The diagnostic code numbers appearing opposite the listed ratable disabilities are arbitrary numbers for the purpose of showing the basis of the evaluation assigned and for statistical analysis in the Department of Veterans Affairs." 38 C.F.R. § 4.27.

Here, the extent of the Board's action was to identify for the first time the specific situs of Read's disability so as to determine the Diagnostic Code that properly correlates the benefit to which Read is entitled and the injury he incurred. Because § 1159 does not protect the fact of a disability, as discussed above, the change in the determination of the applicable Diagnostic Code likewise is unprotected. Thus, there is no violation of § 1159 by a determination that the situs of Read's disability for purposes of determining the correct Diagnostic Code in his case is Muscle Group XV and not Muscle Group XIII.

Even if § 1159 *does* protect the fact of a disability, to prevail, Read must show that the change in situs effectively determined that he had no disability in Muscle Group XIII. This he cannot do, because regardless of the situs of Read's disability, his disability remains the same and remains service connected.

Read argues that the disability he incurred is specifically tied to the Muscle Group diagnosed as affected, and that the change in diagnosis of the affected Muscle Group from Muscle Group XIII to Muscle Group XV severed the service connection for the disability to Muscle Group XIII. In other words, he contends that because he was, but is no longer, service connected for a disability to Muscle Group XIII, he has established a violation of 38 U.S.C. § 1159. The government responds that "disability" should be "broadly defined in a common sense manner as the effect on the functional impairment that results from an in-service injury or disease," *Oral Arg.* at 22:18-32, *available at* http://www.cafc.uscourts.gov/oral-argument-recordings/ 2010-7100/all, or more compactly as "residuals of a gunshot wound to the right thigh." Br. of Gov't 9. The government argues that because the same disability was involved in both the initial disability determination— without a specific diagnosis of Muscle Group XIII—and the later specific identification of Muscle Group XV, the change in Diagnostic Code did not sever anything. This court agrees with the government.

First, although the statute does not define "disability," the regulations define disability of the musculoskeletal system as "primarily the inability, due to damage or infection in parts of the system, to perform the normal working movements of the body with normal excursion, strength, speed, coordination and endurance." 38 C.F.R. § 4.40. This definition leaves little room for Read's argument that the disability must be tied directly to a particular muscle group. Instead, the disability for which service connection is protected is more generally associated with the veteran's inability to perform certain acts. Read's singular disability of pain and weakness in his right thigh are equally attributable to a situs of disability in Muscle Group XV or in Muscle Group XIII. Moreover, 38 C.F.R. § 4.55 specifically limits the relevance of Muscle Groups to the rating context, thus precluding a definition of

disability based on the identification of the Muscle Group involved. 38 C.F.R. § 4.55 ("<u>For rating purposes</u>, the skeletal muscles of the body are divided into 23 muscle groups in 5 anatomical regions." (emphasis added)).

Second, as discussed above, the purpose of 38 U.S.C. § 1159 was to protect veterans with long-standing determinations of service connection from suddenly having the determination of service connection stripped. There is nothing in the legislative history that manifests any concern about the situs of the disability or the Diagnostic Code associated with it, and expanding the protection of § 1159 to such situs determinations or Diagnostic Codes does nothing to advance Congress' intention. *See* VAOPGCPREC 50-91 (Mar. 29, 1991) (precedential opinion of the VA general counsel) (noting that it would be "beyond the legislative purpose" to allow a veteran to be service connected for two disabilities because of the protection of the statute where only one is shown by the medical evidence). The VA has not changed its determination that Read's gunshot wound was incurred in connection with his military service, or that Read is entitled to compensation for the disability he incurred as a result. To determine that the change of the situs of the disability—or the Diagnostic Code associated with it—was a severance of one service connected disability and an establishment of another, where the cause of the disability and the resultant functional impairment are the same, would ill-serve the purpose of the statute.

Third, our view is consistent with the interpretation of the statute by the VA General Counsel and by the Veterans Court. In a March 29, 1991 opinion of the general counsel, the VA determined that a veteran had been service connected for a donor site scar on the left iliac crest, where the medical evidence showed only one donor site scar on the *right* iliac crest. VAOPGCPREC 50-91 (Mar. 29, 1991). The VA determined that 38 U.S.C. §

359 (the previous codification of 38 U.S.C. § 1159) does "not prohibit the redesignation of an existing service connected rating to accurately reflect the actual anatomical location of the injury or disease resulting in the veteran's disability, provided the redesignation does not result in the severance of service connection for the disability in question." *Id.* Otherwise, the VA reasoned, the statute would lead to the "clearly absurd result[]" that a veteran would be service connected for two disabilities where only one was shown. *Id.* Thus, a change in the situs of the disability does not change the categorization of the disability such that service connection for one disability is severed and service connection for another disability is created.

A later opinion by the general counsel reiterated that § 1159 does not protect a prior improper diagnosis where the evidence reveals the proper diagnosis, even where the Diagnostic Code is changed. VAOPGCPREC 13-92 (June 2, 1992). In particular, the veteran there was previously diagnosed as having "Arthritis degenerative (hypertrophic or osteoarthritis)" under Diagnostic Code 5003, but after ten years it was determined that the proper diagnosis was "Arthritis due to trauma, established by X-ray findings: Rate as arthritis, degenerative" under Diagnostic Code 5010. *Id.* The VA drew a distinction between a "disability" and a "diagnosis," noting that § 1159 "protects service connection for any disability or death, not diagnosis. . . . The modification in the diagnosis had no effect on the veteran's service-connected status for the lower-back condition, and service connection for that condition was not terminated." *Id.*

The Veterans Court found these opinions persuasive and applied them in *Gifford v. Brown*, 6 Vet. App. 269 (1994). There, a veteran challenged a Board determination that corrected the situs of his injury from the right thigh to the left thigh on the basis of § 1159. The Veter-

ans Court held that the correction of the situs of the injury was not a violation of § 1159, noting that the veteran "remains service connected for a gunshot wound of the thigh." *Id.* at 270. The Veterans Court categorized the change in the situs as a nonsubstantive change that did not sever service connection for any disability. Read's case is substantially similar to *Gifford*, in that there is but one disability that was apparently misdiagnosed. Nothing in the record suggests otherwise.

While the opinions of the VA general counsel are not binding on this court, they are entitled to consideration for their power to persuade in light of the agency's expertise. *See Wanless v. Shinseki*, 618 F.3d 1333, 1338 (Fed. Cir. 2010) (applying *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). This court finds the reasoning in these opinions persuasive. We also find the Veterans Court's application of these opinions in *Gifford* persuasive.

For the above reasons, this court holds that service connection for a "disability" is not severed simply because the situs of a disability—or the Diagnostic Code associated with it—is corrected to more accurately determine the benefit to which a veteran may be entitled for a service connected disability.

CONCLUSION

For the foregoing reasons, this court affirms the determination by the Veterans Court that the VA did not violate 38 U.S.C. § 1159 by changing the situs of Read's disability from Muscle Group XIII to Muscle Group XV.

**AFFIRMED**

COSTS

Each party shall bear its own costs.