# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 17-0794

Reginald E. Hedgepeth, Appellant,

v.

Robert L. Wilkie,
Secretary of Veterans Affairs, Appellee.

On Appeal from the Board of Veterans' Appeals

(Decided November 7, 2018)

*Mark Wolfgang*, of Menlo Park, California, was on the brief for the appellant.

*James M. Byrne*, General Counsel; *Mary Ann Flynn,* Chief Counsel; *Richard Daley,* Deputy Chief Counsel; *Stuart Anderson*, Appellate Attorney, all of Washington, D.C., were on the brief for the appellee.

Before GREENBERG and TOTH, *Judges*, and MOORMAN, *Senior Judge*,[1]

MOORMAN, *Senior Judge*: The appellant, Reginald E. Hedgepeth, appeals through counsel a February 7, 2017, decision of the Board of Veterans' Appeals (Board) that determined that the reduction from 70% to 0% of the disability rating assigned to his service-connected PTSD was proper and denied entitlement to a total disability rating based on individual unemployability (TDIU) after April 1, 2016. Record (R.) at 2-15. This appeal is timely, and the Court has jurisdiction to review the Board's decision under 38 U.S.C. § 7252(a). Because the Board based the elimination of the appellant's VA benefits on medical evidence showing a change of diagnosis from PTSD to personality disorder, the Court holds that, under these circumstances, statutory law

---

[1]Judge Moorman is a Senior Judge acting in recall status. *In re: Recall of Retired Judge*, U.S. Vet. App. Misc. Order 02-18 (Jan. 16, 2018).

and regulations require VA to initiate and conduct severance-of-service-connection proceedings before eliminating service-connected VA benefits. The Court will therefore reverse the Board's decision on reduction of his disability rating for Mr. Hedgepeth's service-connected PTSD from 70% to 0%, and denial of entitlement to TDIU after April 1, 2016, and remand the matters for further proceedings consistent with this decision.

## I. BACKGROUND

Mr. Hedgepeth served on active duty in the U.S. Navy from April 1981 to March 1983. R. at 411. In December 1992, he reported viewing violence from shipboard off the coast of Lebanon. *See* R. at 3371-72 (describing seeing through the ship's binoculars women, children, and babies being killed), R. at 2373 ("[The Board observes [the U.S.S. Raleigh] did visit Beirut in 1983.").

In April 2005, Mr. Hedgepeth applied for VA compensation for mental problems. R. at 2930-43. He submitted with the application a medical record showing a diagnosis of PTSD and depressive disorder. R. at 2951. In March 2006, the regional office (RO) denied the claims for PTSD based on the lack of evidence of an in-service stressor and for depressive disorder for a lack of evidence connecting the disorder to military service. R. at 2881-83. The same month, Mr. Hedgepeth filed a Notice of Disagreement (NOD), in which he described in-service stressors he had experienced on active duty. R. at 2854-67. In a July 2009 Board hearing, Mr. Hedgepeth identified the in-service stressors that he believed caused his PTSD and major depressive disorder. R. at 2386, 2391.

Following the hearing, the Board remanded the claim for further development, to include verification of his reported stressor and provision of a psychiatric examination. R. at 2374. According to the Board's instructions, Dr. J. Murray McNiel, Ph.D., conducted a mental health examination in January 2010. R. at 2334-42. Dr. McNiel diagnosed Mr. Hedgepeth with PTSD and major depressive disorder, R. at 2342, and found that Mr. Hedgepeth's witnessing the destruction in Beirut through binoculars met the criterion for a stressor, R. at 2339.

In a March 2010 decision, the RO granted service connection for PTSD with major depressive disorder with an evaluation of 30%, effective April 8, 2005. R. at 2329-32. In

2

September 2010, Mr. Hedgepeth filed an NOD with all issues contained in the rating decision. R. at 2310. In a January 2012 Statement of the Case (SOC), the RO continued the 30% rating. R. at 1798-1819. In February 2012, Mr. Hedgepeth filed a Notice of Appeal to the Board. R. at 1793-95. He argued that the record as a whole clearly showed he was unable to work and was entitled to TDIU or, in the alternative, that the rating should be increased to at least 50% considering the symptoms shown in the record. R. at 1793.

From June to October 2012, Mr. Hedgepeth visited the emergency room (ER) multiple times with psychiatric complaints. Treatment records from July and September 2012 show a diagnosis of PTSD and major depressive disorder. R. at 1443, 1485. VA thereafter ordered a second examination to assess the level of disability associated with PTSD.

Mr. Hedgepeth underwent a second VA PTSD examination, conducted by Dr. Michael P. Griffin, Ph.D., in February 2013. R. 1771-87. Dr. Griffin noted that, since the 2010 examination, Mr. Hedgepeth had been diagnosed with PTSD, cocaine dependence, a history of substance-induced major depression, depressive disorder not otherwise specified, substance dependence, and rule-out personality disorder with cluster B traits. R. at 1779. Based on a drug screening and Mr. Hedgepeth's behavior, Dr. Griffin diagnosed cocaine intoxication and offered the following assessment:

> Taken with his tendency during the present evaluation to embellish or fabricate psychiatric symptoms, as well as complications from his aforementioned cocaine intoxication, there is not sufficient evidence to support the presence of ongoing anxious or depressive symptoms. As such, the diagnosis of PTSD offered during his January 2010 C&P [Compensation and Pension] PTSD Initial Examination . . . is not confirmed at this time.

R. at 1773. The RO then issued a decision stating that the initial 30% evaluation for PTSD with major depressive disorder was proper and denied entitlement to TDIU. R. at 1769.

On appeal, the Board held a second hearing in July 2013. R. at 1565-93. Mr. Hedgepeth testified to the same in-service stressors he had reported before. R. at 1571. He stated that his fixation on the horrors of the attack in Beirut had made him unable to work and interfered with his personal relationships. R. at 1581. In January 2015, the Board concluded that Mr. Hedgepeth met the criteria for an initial rating of 70% for service-connected PTSD and major depressive disorder

for the entire appeal period and remanded the case with instructions to schedule an examination to determine the effects of Mr. Hedgepeth's service-connected PTSD and major depressive disorder on his ability to maintain employment consistent with his education and occupational experience. R. at 1402.

In June 2015, Dr. Julia Messer, Ph.D., conducted a third examination, as directed by the Board's January 2015 remand instructions. R. at 412-35. Dr. Messer explained that, although Mr. Hedgepeth had endorsed every item on the PTSD checklist to assess current symptoms of PTSD, she could not interpret the results of the PTSD checklist with confidence. She explained that she suspected that Mr. Hedepeth had exaggerated his symptoms on the checklist because he had not reported such symptoms during the clinical interview. R. at 435. Dr. Messer diagnosed Mr. Hedgepeth with "other specified personality disorder, mixed personality features," noting that the symptoms of anxiety and depression appear to be best accounted for by the diagnosis of other specified personality disorder. R. at 412. Dr. Messer concluded that, in her opinion, the criteria for a separate anxiety or depressive disorder were not met and that Mr. Hedgepeth's symptoms resulted in occupational and social impairment with reduced reliability and productivity. R. at 412, 417.

Following Dr. Messer's examination, the RO issued a decision in October 2015 proposing to decrease Mr. Hedgepeth's PTSD rating to 0%, based on Dr. Messer's conclusions that the criteria for PTSD with major depressive disorder were no longer met. R. at 234-35. The RO then scheduled a fourth examination to reconcile the conflicting mental health diagnoses of record. R. at 182. Dr. Stacey Kovac, Ph.D., conducted an examination in January 2016. R. at 160-78. Dr. Kovac diagnosed Mr. Hedgepeth with "other specified personality disorder, mixed personality features," and concluded that he did not describe symptoms that met the PTSD diagnostic criteria. R. at 160. Dr. Kovac opined that Mr. Hedgepeth had experienced occupational and social impairment with deficiencies in most areas, noting that his occupational functioning was seriously impaired by personality disorder traits. R. at 162. Finally, Dr. Kovac opined that Mr. Hedgepeth's psychological symptoms resulted in deficiencies corresponding to a 70% disability rating, including "[d]ifficulty in establishing and maintaining effective work and social relationships"; "[d]ifficulty in adapting to stressful circumstances, including work or a worklike setting"; and "[i]nability to establish and maintain effective relationships." R. at 173.

In a January 2016 decision, the RO reduced Mr. Hedgepeth's rating to 0%, effective from April 1, 2016. R. 154. Mr. Hedgepeth filed an NOD. R. 145. In February 2016, Mr. Hedgepeth sought treatment at the ER because of "things in his head," including seeing and hearing ghosts. R. at 131. At the ER, a social worker recorded a diagnosis of PTSD. R. at 133.

In March 2016, the RO issued an SOC that maintained that the disability rating reduction for PTSD with major depressive disorder from 70% to 0%, was proper. R. at 123. In April 2016, the Board issued a decision granting TDIU from April 2005 to April 2016 and remanding the issue for a determination of whether Mr. Hedgepeth met the requirements for an extraschedular TDIU rating for the period beginning on or after April 1, 2016. R. at 102. In November 2016, the director of the Compensation Service denied entitlement to an extraschedular TDIU rating. R. at 31-33. In February 2017, the Board issued the decision on appeal. R. at 2. This appeal followed.

## II. ANALYSIS
### A. Parties' Arguments

Mr. Hedgepeth argues that the Board failed to properly apply 38 C.F.R. §§ 3.343 and 3.344 when reducing his "protected" disability rating for PTSD from 70% to 0% and discontinuing his TDIU effective from April 1, 2016. Appellant's Brief (App. Br.) at 12-25. He also argues that the Board erroneously determined that a rating reduction was proper because the reduction amounts to a de facto severance of service connection for PTSD without the procedural protections for severance found in 38 U.S.C. § 1159 and 38 C.F.R.§ 3.105(d). *Id.* at 22-25; Reply Br. at 6-9. He argues that reversal is warranted because the Board's reduction in rating and discontinuance of TDIU was contrary to law. App. Br. at 12, 28.

In response, the Secretary argues that the statutes and regulations concerning both rating reductions and severance of service connection do not apply to this case because the Board "reattributed" Mr. Hedgepeth's psychological symptoms to a non-service-connected disability. Secretary's (Sec.) Br. at 10-15; *see* 38 C.F.R. §§ 3.343, 3.344 (2018). He admits that the appellant's employability and psychological symptoms have not improved since his 70% rating and TDIU were awarded but asserts that this lack of improvement is immaterial because the Board properly reattributed the appellant's symptoms and nonemployability to a nonservice-connected disability,

a personality disorder. Sec. Br. at 15. He also asserts that the Board's discussion and application of § 3.344 was harmless error. *Id.* at 14-15, 19-21. Finally, the Secretary argues that the laws concerning severance of service connection also do not apply in this case because the appellant is still service connected for PTSD and because, again, his psychological symptoms have been "reattributed" to a non-service-connected disability. *Id.* at 16-19.

## B. Applicable Law and Regulations

### 1. Disability Rating Reductions

Where a veteran's disability rating is reduced, the Board must determine whether the reduction of the veteran's disability rating was proper and must not phrase the issue in terms of whether the veteran was entitled to an increased rating, including whether the veteran was entitled to restoration of a previous rating. *See Dofflemyer v. Derwinski*, 2 Vet.App. 277, 279-80 (1992); *see also Peyton v. Derwinski*, 1 Vet.App. 282, 286 (1991) ("This is a rating reduction case, not a rating increase case."). Under 38 C.F.R. § 3.344(a), for disability ratings, such as the appellant's in this case, that have been in effect for long periods at the same level (protected ratings), "[e]xaminations less full and complete than those on which payments were authorized or continued will not be used as a basis of reduction." 38 C.F.R. § 3.344(a) (2018); *see* 38 C.F.R. § 3.344(c) (provisions of § 3.344(a) apply to ratings that have continued for 5 years or more). Section 3.344 also provides that "[r]atings on account of disease subject to temporary or episodic improvement . . . will not be reduced on any one examination, except in those instances where all the evidence of record clearly warrants the conclusion that sustained improvement has been demonstrated." § 3.344(a). That regulatory section further provides that, even where the evidence clearly reflects material improvement in a service-connected condition, VA must "consider whether the evidence makes it reasonably certain that the improvement will be maintained under the ordinary conditions of life." *Id.*

Finally, § 3.344(a) instructs that

rating boards encountering a change of diagnosis will exercise caution in the determination as to whether a change in diagnosis represents no more than a progression of an earlier diagnosis, an error in prior diagnosis or possibly a disease entity independent of the service-connected disability. When the new diagnosis reflects mental deficiency or personality disorder only, the possibility of only temporary remission of a super-imposed psychiatric disease will be borne in mind.

6

*Id.*

If the reduction of a protected rating is at issue, the Board must "establish, by a preponderance of the evidence and in compliance [with] 38 C.F.R. § 3.344, that a rating reduction is warranted." *Sorakubo v. Principi*, 16 Vet.App. 120, 123-24 (2002) (citing *Brown v. Brown*, 5 Vet.App. 413, 421 (1993)). In *Brown*, 5 Vet.App. at 421, the Court held that "in any . . . reduction case[,] not only must it be determined that an improvement in a disability has actually occurred[,] but also that that improvement actually reflects an improvement in the veteran's ability to function under the ordinary conditions of life and work." *See* 38 C.F.R. 4.2 (2018) (directing that "[e]ach disability must be considered from the point of view of the veteran working or seeking work"); 38 C.F.R. § 4.10 (2018) (stating that "[t]he basis of disability evaluations is the ability of the body as a whole, or of the psyche, or of a system or organ of the body, to function under the ordinary conditions of daily life, including employment").

Since deciding *Brown*, the Court has made clear that VA errs when it reduces an evaluation without complying with the "general VA regulations applicable to all [ ]reduction cases, regardless of the [evaluation] level or the length of time that the [evaluation] has been in effect," including the specific requirements of §§ 4.2 and 4.10. *Faust v. West*, 13 Vet.App. 342, 349 (2000); *see Murphy v. Shinseki*, 26 Vet.App. 510, 517 (2014) (holding that the Board erred in effectively reducing the veteran's 30% sinusitis evaluation to 10% because it "did not make the findings that an AOJ [agency of original jurisdiction] would be required to make to justify a reduction in a disability evaluation," including whether any improvement in sinusitis "indicated an improvement, if it existed, in his ability to function under the ordinary conditions of life and work"). Therefore, VA may not reduce a veteran's disability evaluation without first finding, inter alia, that the veteran's service-connected disability has improved to the point that he or she is now better able to function under the ordinary conditions of life and work. *See Murphy*, 26 Vet.App. at 517; *Faust*, 13 Vet.App. at 349; *Brown*, 5 Vet.App. at 421.

### 2. Reduction of TDIU

Additional procedural protections for total disability ratings are set forth in 38 C.F.R. § 3.343, which provides:

(a) General. Total disability ratings, when warranted by the severity of the condition and not granted purely because of hospital, surgical, or home treatment, or individual

unemployability will not be reduced, in the absence of clear error, without examination showing material improvement in physical or mental condition. Examination reports showing material improvement must be evaluated in conjunction with all the facts of record, and consideration must be given particularly to whether the veteran attained improvement under the ordinary conditions of life, i.e., while working or actively seeking work or whether the symptoms have been brought under control by prolonged rest, or generally, by following a regimen which precludes work, and, if the latter, reduction from total disability ratings will not be considered pending reexamination after a period of employment (3 to 6 months).
. . . .
(c) Individual unemployability. (1) In reducing a rating of 100 percent service-connected disability based on individual unemployability . . . caution must be exercised in such a determination that actual employability is established by clear and convincing evidence. . . .
(2) If a veteran with a total disability rating for compensation purposes based on individual unemployability begins to engage in a substantially gainful occupation . . . the veteran's rating may not be reduced solely on the basis of having secured and followed such substantially gainful occupation unless the veteran maintains the occupation for a period of 12 consecutive months.

38 C.F.R. § 3.343(a), (c).

### 3. Severance of Service Connection

VA has established that "[s]ervice connection will be severed only where evidence establishes that it is clearly and unmistakably erroneous (the burden of proof being on the Government)." 38 C.F.R. § 3.105(d) (2018). Further,

[a] change in diagnosis may be accepted as a basis for severance action if the . . . proper medical authority certifies that, in the light of all accumulated evidence, the diagnosis on which service connection was predicated is clearly erroneous. This certification must be accompanied by a summary of the facts, findings, and reasons supporting the conclusion. When severance of service connection is considered warranted, a rating proposing severance will be prepared setting forth all material facts and reasons.

*Id.*

To demonstrate that severance is proper, the Secretary is not limited to the law and the record that existed at the time of the original decision awarding service connection. *See Stallworth v. Nicholson*, 20 Vet.App. 482, 488 (2006). "Consequently, the severance decision focuses—not on whether the original decision was clearly erroneous—but on whether the current 'evidence establishes that [service connection] *is* clearly erroneous.'" *Id.* (quoting 38 C.F.R. § 3.105(d)

8

(2006)). Severance of service connection based on any standard less than that established by § 3.105(d) is erroneous as a matter of law. *Id.*

In every decision, the Board must provide a statement of the reasons or bases for its determination, adequate to enable an appellant to understand the precise basis for the Board's decision as well as to facilitate review in this Court. 38 U.S.C. § 7104(d)(1); *Allday v. Brown*, 7 Vet.App. 517, 527 (1995); *Gilbert v. Derwinski*, 1 Vet.App. 49, 56-57 (1990). To comply with this requirement, the Board must analyze the credibility and probative value of the evidence, account for the evidence it finds persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the claimant. *Caluza v. Brown*, 7 Vet.App. 498, 506 (1995), *aff'd per curiam,* 78 F.3d 604 (Fed. Cir. 1996) (table).

## C. Application of the Law to the Facts

The Court agrees with the appellant that the Board made its decision without observance of the law and that the decision contains clear error. As the appellant asserts, the Secretary's arguments are "merely [] post-hoc rationalization[s] calculated to address why the Board failed to analyze the rating reduction under the existing statutory and regulatory framework." Reply Br. at 2. The existing statutory and regulatory framework provides that, to reduce a veteran's disability rating, VA must follow the requirements of §§ 3.343 and 3.344, which pertain to reduction of TDIU and reduction of a disability rating, respectively. In the alternative, to sever service connection based on a change of diagnosis, VA must follow the requirements of 38 U.S.C. § 1159 and 38 C.F.R. § 3.105(d).

The applicable laws and regulations do not provide, as the Secretary attempts to argue, for an avenue of "reattribution" of symptoms from a service-connected condition to a non-service-connected condition in order to reduce or eliminate VA benefits, and, significantly, in his brief, the Secretary cites to no such laws, regulations, or caselaw supporting his "reattribution" argument. Finding that the avenue for elimination of service-connected benefits of "reattribution" of symptoms exists would allow for the Board to circumvent the protections set up by Congress and VA to safeguard against the very thing that has occurred in this case – VA's elimination of a long-standing award of benefits without following the proper procedural steps and overcoming the heightened burden on the government to ensure that the elimination of benefits was warranted. *See*

9

*Stallworth*, 20 Vet.App. at 488 (holding that severance of service connection based on any standard less than that established by § 3.105(d) is erroneous as a matter of law).

In the decision here on appeal, the Board chose the avenue of a rating reduction to eliminate the veteran's award of benefits by reducing his protected rating from 70% to 0%, R. at 13, and discontinuing his TDIU award effective after April 1, 2016, R. at 14-15. In doing so, the Board committed two separate errors. First, the Board failed to properly apply §§ 3.343 and 3.344, which, respectively, require VA to find clear and convincing evidence of employability before discontinuing TDIU and "material improvement" of symptoms before reducing a disability rating. Second, the Board failed to apply to the appellant's case the statutes, regulations, and caselaw governing severance of service connection.

First, although the Board discussed the § 3.344 requirements for reducing the appellant's disability rating for PTSD from 70% to 0%, all the medical evidence the Board cited as supporting the "improvement" of the appellant's psychological symptoms clearly shows that the very opposite was true – that the veteran's symptoms and their frequency and severity had remained unchanged since the 70% rating was assigned. R. at 9-12. The Board, nonetheless, found that "the preponderance of the evidence establishes improvement in both hip [sic] disorders" and that the requirements of § 3.344 were thus met. R. at 13. The Board explained that "[w]hile the [v]eteran may have had symptoms that were previously associated to PTSD and major depressive disorder, the 2015 and 2016 examination[s] show improvement and that his current symptoms are attributed to a nonservice-connected personality disorder." *Id.* Therefore, although the Board attempted to frame its decision in terms of the § 3.344 requirement of "material improvement," a review of the Board's reasoning reveals that, actually, the Board's "reduction" of the appellant's rating from 70% to 0% was based on the medical evidence of record showing a change of diagnosis from PTSD to a personality disorder. Indeed, the Board explicitly noted that "while the prior award was predicated on the [v]eteran's psychiatric symptomology being attributed to a service[-]connected PTSD with major depressive disorder, the record shows that a nonservice-connected personality disorder – and not PTSD or major depressive disorder – is the most appropriate current diagnosis." *Id.*

Further, the Board failed to acknowledge relevant instructions in § 3.344(a) that

10

rating boards encountering a change of diagnosis will exercise caution in the determination as to whether a change in diagnosis represents no more than a progression of an earlier diagnosis, an error in prior diagnosis or possibly a disease entity independent of the service-connected disability. When the new diagnosis reflects mental deficiency or personality disorder only, the possibility of only temporary remission of a super-imposed psychiatric disease will be borne in mind.

38 C.F.R. § 3.344(a). The Board should have discussed these relevant regulatory instructions and determined whether the appellant's "change of diagnosis represent[ed] no more than a progression of an earlier diagnosis, an error in prior diagnosis or possibly a disease entity independent of the service-connected disability" and whether the "new diagnosis" of a personality disorder represented "only temporary remission of a super-imposed psychiatric disease." *Id.*

Thus, the Court finds that the Board erred when it determined that a reduction of the appellant's rating under § 3.344 was warranted. *See Murphy*, 26 Vet.App. at 517; *Faust*, 13 Vet.App. at 349; *Brown*, 5 Vet.App. at 421.

Concerning TDIU, the Board failed entirely to consider or apply § 3.343, which governs reductions of TDIU awards. Instead, the Board concluded that "the [v]eteran remained unable to establish and maintain effective relationships and had difficulty in adapting to stressful circumstances, including work or a worklike setting. However, these occupational problems were not attributed to PTSD and major depressive disorder." R. at 15. The Board fully acknowledged that the veteran remained unemployable after April 1, 2016, despite its determination that an award of TDIU effective after that date was not warranted. *Id.* Instead, the Board improperly framed the issue on appeal as "entitlement" to non-schedular TDIU after April 1, 2016, since "the [v]eteran did not satisfy the schedular requirements for TDIU beginning April 1, 2016, because of the RO's rating reduction for the [v]eteran's psychiatric disability." R. at 14. A review of the record shows that the issue on appeal should have properly been framed as *discontinuance* of TDIU effective from April 1, 2016. *See Dofflemyer*, 2 Vet.App. at 279 (holding that Board incorrectly phrased the issue on appeal as increased rating instead of whether reduction of appellant's 100% rating was proper). VA's framing the issue as one of entitlement to TDIU rather than discontinuance of benefits is significant because, by doing so, VA wrongly shifted the burden of proof from VA to the appellant. *See Brown*, 5 Vet.App. at 421 (when the RO reduces a rating, the Board bears the burden to establish that rating reduction was warranted). The Board therefore committed error

11

when it failed to discontinue the TDIU award under the requirements of § 3.343.

The Court now turns to the Board's second error – its failure to apply to the appellant's case the statutes, regulations, and caselaw governing severance of service connection. The Secretary argues that 38 U.S.C. § 1159, which governs severance of service connection, also did not apply to this case and that "[i]nvestigation of the meaning of service connection supports this conclusion." Sec. Br. at 15-16. In support, he cites *Read v. Shinseki,* in which the Federal Circuit found that section 1159 applied only to "the third of the five elements of an application for benefits – that of the connection between the veteran's service and disability." 651 F.3d 1296, 1300 (Fed. Cir 2011) (noting the "'five common elements to a veteran's application for benefits: [1] status as a veteran, [2] the existence of disability, [3] a connection between the veteran's service and the disability [(i.e. service connection)], [4] the degree of the disability, and [5] the effective date of the disability.'" (alteration in original) (quoting *Collaro v. West*, 136 F.3d 1304, 1308 (Fed. Cir. 1998))). The Secretary asserts that "[u]nder that precedent, then, neither the existence of PTSD (which the Board did not challenge) nor the rating assigned to it would fall under the protection of § 1159." Sec. Br. at 17.

However, again, the Court does not agree. The Federal Circuit in *Read* defined the third element of "service-connected disability" as one "'incurred or aggravated . . . in line of duty in the active military, naval, or air service.'" 651 F.3d at 1300 (quoting 38 U.S.C. § 101(16)). "Thus, to sever service connection is to conclude that a particular disability previously determined to have been incurred in the line of duty was incurred otherwise." *Id.* This is exactly what occurred in this case. By finding that the diagnosis accounting for the appellant's psychological symptoms had changed from PTSD to a personality disorder, R. at 13, the Board, in effect, determined that it was no longer correct to say that the appellant's disability had a nexus to his military service because the diagnosis change necessarily indicated that the etiology of the appellant's symptoms was a personality disorder, which cannot be service-connected as a matter of law, *see* 38 C.F.R. § 4.127 (2018), rather than PTSD – a disability for which service connection is established when, as here, VA has previously found that the record contains evidence of a verified in-service stressor and medical evidence of a nexus between the current PTSD symptoms and the in-service stressor, *see* 38 C.F.R. §3.304(f) (2018).

12

Further, in *Read*, the diagnosis of the veteran's gunshot wound disability was changed from a wound affecting Muscle Group XIII to Muscle Group XV, which changed the diagnostic code applicable to his disability. 651 F.3d at 1301. The Federal Circuit held that a finding of such a change in diagnosis amounted to a finding that "the situs of Read's disability for purposes of determining the correct [d]iagnostic [c]ode . . . is Muscle Group XV and not Muscle Group XIII" and did not constitute an element 3 finding regarding "service connection." *Id*. Even though both cases involve a change of diagnosis, the facts of Mr. Hedgepeth's case are distinguishable from those of *Read* because, again, the diagnosis change in Mr. Hedgepeth's case involves the "service connection" element since the change had the effect of altering the cause of the appellant's symptoms from PTSD, a disability for which service connection is permitted, to a personality disorder, a disability that cannot be service-connected as a matter of law. The diagnosis change in *Read*, on the other hand, had the effect of altering only the applicable diagnostic code; the change did not disturb the service-connected status of Read's gunshot wound disability.

In sum, the Board clearly based the elimination of VA benefits in this case on medical evidence showing a change of diagnosis from PTSD to personality disorder. R. at 9-13. Under these circumstances, the applicable law and regulations require VA to initiate and conduct severance of service connection proceedings before eliminating service-connected VA benefits. *See Read*, 651 F.3d at 1300; 38 C.F.R. §3.105(d). The Board may not, without going through the proper channels of severance, perform a de facto severance by attempting to apply the regulations governing rating reductions while also finding that the "reduction" is based upon a change of diagnosis rather than material improvement of symptoms. *See Read*, 651 F.3d at 1300; *Stallworth,* 20 Vet.App. at 488.

### D. Remedy

Having found Board error, the Court must determine the proper remedy. Where the Board fails to observe applicable law and regulation in reducing a veteran's rating, such a rating is "void ab initio and the Court will set it aside as 'not in accordance with law.'" *Brown*, 5 Vet.App. at 422 (quoting 38 U.S.C. § 7261(a)(3)(A)); *see Kitchens v. Brown*, 7 Vet.App. 320, 325 (1995) (citing *Brown* for same proposition and reversing as to rating reduction); *Dofflemyer*, 2 Vet.App. at 281-82; *see also Hayes v. Brown*, 9 Vet.App. 67, 73 (1996) (citing *Kitchens,* 7 Vet.App. 320, for same

13

proposition and reversing the decision as to rating reduction). Therefore, the Court finds that the Board's determinations reducing the appellant's rating for PTSD from 70% to 0% and discontinuing the award of TDIU effective from April 1, 2016, are void *ab initio* because the Board failed to observe the applicable regulations and improperly shifted the burden of proof to the appellant. The Court reverses the Board's decision reducing the appellant's disability rating and denying entitlement to TDIU effective from April 1, 2016, and remands the matters for the Board to reinstate the appellant's 70% rating for PTSD and reverse the discontinuance of TDIU effective from April 1, 2016.

If VA wishes to pursue the matter of severance of benefits for service-connected PTSD, it must initiate a proper severance proceeding through the proper procedural channels and meet the high standard of proof placed upon VA in such proceedings. *See* 38 U.S.C. § 3.105(d).

## III. CONCLUSION

After consideration of the appellant's and Secretary's briefs, and a review of the record on appeal, the Board's February 7, 2017, decision as to reduction of the appellant's disability rating for service-connected PTSD from 70% to 0% and discontinuance of TDIU after April 1, 2016, is REVERSED and the matters are REMANDED for further proceedings consistent with this decision.