﻿Citation Nr: AXXXXXXXX
Decision Date: 09/29/20 Archive Date: 09/29/20

DOCKET NO. 190424-53339
DATE: September 29, 2020

ORDER

Entitlement to service connection for throat cancer is denied. 

Entitlement to a total disability rating based on individual unemployability (TDIU) is granted. 

FINDINGS OF FACT

1. The law and evidence available for consideration does not support the finding that the Veteran was exposed to herbicide agents during his active duty service. 

2. The combined effects of the Veteran’s service-connected disabilities have precluded substantially gainful employment.

CONCLUSIONS OF LAW

1. The criteria for entitlement to service connection for throat cancer have not been met. 38 U.S.C. §§ 1155, 5103, 5103A, 5107 (2012); 38 C.F.R. §§ 3.102, 3.159, 3.303 (2019).

2. The criteria for entitlement to TDIU have been met. 38 U.S.C. § 1155 (2012); 38 C.F.R. §§ 3.340, 3.341, 4.16, 4.18 (2019).

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Veteran served on active duty in the Navy from May 1969 to May 1971. 

This matter comes before the Board of Veterans’ Appeals (Board) on appeal from a January 2019 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) Agency of Original Jurisdiction (AOJ).

As an initial matter, on August 23, 2017, the President signed into law the Veterans Appeals Improvement and Modernization Act, Pub. L. No. 115-55 (to be codified as amended in scattered sections of 38 U.S.C.), 131 Stat. 1105 (2017), also known as the Appeals Modernization Act (AMA). This law, which went into effect in February 2019, creates a new framework for Veterans dissatisfied with VA’s decision on their claim to seek review. 

Following the January 2019 rating decision denying the claims for entitlement to service connection for throat cancer and entitlement to TDIU, the Veteran submitted a VA Form 10182 Notice of Disagreement appealing this rating decision to the Board and sought the evidence review lane. The Board is honoring his choice and, accordingly, this decision has been written consistent with the new AMA framework.

Service Connection

Service connection may be granted for a current disability resulting from disease or injury incurred in or aggravated by service. 38 U.S.C. §§ 1110; 38 C.F.R. §§ 3.303. Service connection may also be granted for any disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. §§ 3.303(d). The requirement that a current disability exist is satisfied if the claimant had a disability at the time the claim for VA disability compensation was filed or during the pendency of the claim. McClain v. Nicholson, 21 Vet. App. 319, 321 (2007).

Establishing service connection generally requires evidence of (1) a current disability; (2) an in-service incurrence or aggravation of a disease or injury; and (3) a nexus between the claimed in-service disease or injury and the present disability. Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004).

The law establishes a presumption of entitlement to service connection for diseases associated with exposure to certain herbicide agents and also provides a presumption of exposure for veterans who served in the Republic of Vietnam. See 38 U.S.C. § 1116; 38 C.F.R. §§ 3.307(a)(6), 3.309(e). In such circumstances, service connection may be granted on a presumptive basis for the diseases listed in 38 C.F.R. § 3.309(e), if manifested to a compensable degree at any time after active service. 38 U.S.C. § 1116 (a)(1); 38 C.F.R. § 3.307 (a)(6)(ii).

Lay evidence is competent to establish the presence of observable symptomatology and “may provide sufficient support for a claim of service connection.” Layno v. Brown, 6 Vet. App. 465, 469 (1994). When a condition is capable of lay observation and may be diagnosed by its unique and readily identifiable features, the presence of the disorder is not a determination “medical in nature.” 

Lay evidence can be competent and sufficient to establish a diagnosis when a layperson (1) is competent to identify the medical condition; or, (2) is reporting a contemporaneous medical diagnosis; or, (3) describes symptoms at the time which supports a later diagnosis by a medical professional. See Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007). Although a lay person is competent in certain situations to provide a diagnosis of a simple condition, a lay person is not competent to provide evidence as to more complex medical questions. See Woehlaert v. Nicholson, 21 Vet. App. 456 (2007). Likewise, mere conclusory or generalized lay statements that a service event or illness caused a current disability are insufficient. Waters v. Shinseki, 601 F.3d 1274, 1278 (2010).

A veteran bears the evidentiary burden to establish all elements of a service connection claim, including the nexus requirement. See Fagan v. Shinseki, 573 F.3d 1282, 1287-88 (2009). In making its ultimate determination, the Board must give a veteran the benefit of the doubt on any issue material to the claim when there is an approximate balance of positive and negative evidence. See Fagan, 573 F.3d at 1287 (quoting 38 U.S.C. §§ 5107(b)). To deny a claim on its merits, the evidence must preponderate against the claim. Alemany v. Brown, 9 Vet. App. 518, 519 (1996). 

Except as otherwise provided by law, a claimant has the responsibility to present and support a claim for benefits. In evaluating a claim, the Board must determine the value of all evidence submitted, including lay and medical evidence. 38 U.S.C. §§ 1154(a); Buchanan v. Nicholson, 451 F.3d 1331, 1335 (Fed. Cir. 2006).

1. Entitlement to service connection for throat cancer 

The law, as it existed at the time the Veteran filed his claim, provides as follows.

A Veteran who, during active military service, served in the Republic of Vietnam during the Vietnam era (beginning in January 1962 and ending in May 1975) shall be presumed to have been exposed to certain herbicide agents, including Agent Orange, unless there is affirmative evidence to establish that the veteran was not exposed to any such agent during service. 38 U.S.C. § 1116.

“Service in the Republic of Vietnam” in this context has a special meaning. Service in the Republic of Vietnam includes service in the waters offshore and service in other locations if the conditions of service involved duty or visitation in the Republic of Vietnam. 38 U.S.C. § 101(29)(A); 38 C.F.R. §§ 3.307(a)(6)(iii), 3.313(a) (2015); see also Haas v. Peake, 525 F.3d 1168 (Fed. Cir. 2008), cert. denied, 129 S. Ct. 1002 (2009) (holding that a Veteran must have actually set foot within the land borders of Vietnam or been present in the inland waters of Vietnam to be entitled to presumptive service connection).

Notably, the Veterans Benefits Administration (VBA) has historically extended the herbicide presumption to naval ships which entered Vietnam’s inland waterways or those which docked to the shore, but did not extend the presumption to naval ships operating in open water (“brown” versus “blue” water ships). Following the Court of Appeals for Veteran’s Claims’ (Court) decision in Gray v. McDonald, 27 Vet. App. 313 (2015), VA issued guidance on the definition of inland and offshore waterways of Vietnam. 27 Vet. App. 313. In addition, VA updated its list of US Navy and Coast Guard ships associated with military service in Vietnam to reflect the new guidance issued with respect to the definition of inland and offshore waterways and possible exposure to herbicides. See Navy and Coast Guard Ships Associated with Service in Vietnam and Exposure to Herbicide Agents, available at http://vbaw.vba.va.gov/bl/21/rating/VENavyShip.htm (Updated September 5, 2017).

Service in the Republic of Vietnam also includes, not only service on land, but also service on ships that were docked to the shore of the Republic of Vietnam, or sent crew members ashore when the claimant was stationed aboard the ship at the time. See 38 C.F.R. § 3.307(a)(6)(iii). Exposure to an herbicide can be conceded if there is evidence which shows that the Veteran’s ship sent crew members ashore during the time the Veteran was stationed aboard the ship, provided that the Veteran submits a statement indicating that he/she went ashore from the ship. Id.

The Veteran contends that he was stationed on the USS Kitty Hawk during his active duty service. The duties associated with his military occupational specialty (MOS) as an aircraft mechanic included “maintaining” planes that came in by sanding and repairing them so they could fly again. Reportedly, a number of the aircrafts came back with a “yellow-looking film on them.” Not knowing what the substance was, the Veteran suggests it may have been an herbicide agent – namely Agent Orange – and that his exposure to this substance caused his throat cancer. 

A review of the record does indicate that the Veteran was stationed aboard the USS Kitty Hawk. The evidence of record able to be considered does not reflect, however, that the USS Kitty Hawk was docked to the shores of the Republic of Vietnam. In fact, the Veteran concedes that the USS Kitty Hawk was a blue water ship. He does not contend that he set foot in Vietnam at any point during his active duty service; his primary contention is that he was exposed to herbicide agents via repairing airplanes that had a yellow substance on them that he suggests was specifically Agent Orange. 

Effective June 19, 2015, VA amended its regulation governing individuals presumed to have been exposed to certain herbicides by expanding the regulation to include an additional group consisting of individuals who performed service in the Air Force or Air Force Reserve under circumstances in which they had regular and repeated contact with C-123 aircraft known to have been used to spray an herbicide agent (“Agent Orange”) during the Vietnam era.

Specifically, the new regulation states that an individual who performed service in the Air Force or Air Force Reserve under circumstances in which the individual concerned regularly and repeatedly operated, maintained, or served onboard C-123 aircraft known to have been used to spray an herbicide agent during the Vietnam era shall be presumed to have been exposed during such service to an herbicide agent.

For purposes of this paragraph, “regularly and repeatedly operated, maintained or served onboard C-123 aircraft” means that the individual was assigned to an Air Force or Air Force Reserve squadron when the squadron was permanently assigned one of the affected aircraft and the individual had an Air Force Specialty Code (AFSC) indicating duties as a flight, ground maintenance, or medical crew member of such aircraft. 38 C.F.R. § 3.307(a)(6)(v).

A review of the Federal Register reveals that some C-123s were used to actually spray herbicide in Vietnam. 80 Fed. Reg. 35,246 (June 19, 2015). For this reason, the presumption of herbicide exposure under 38 C.F.R. § 3.307(a)(6)(v) is limited to contact with C-123 aircraft known to have been used to sprayed an herbicide agent during the Vietnam era. This makes the C-123s a distinct case.

VA has also published a list of military personnel who had regular and repeated exposure to contaminated Operation Ranch Hand (ORH) C-123s, used to spray Agent Orange in Vietnam, as flight, maintenance, or medical crew members. See http://www.benefits.va.gov/compensation/docs/AO_C123_AFSpecialityCodesUnits.pdf.

The Veteran does not contend that he worked on C-123s; moreover, he served in the Navy as opposed to the Air Force or Air Force Reserve. Given this distinction, it is not likely the Veteran worked on C-123s. Based on this and the evidence suggesting that the Veteran served on a blue water ship and never went ashore, the Board cannot concede exposure to herbicide agents. 

The Board is cognizant of a medical opinion associated with the record that provides a nexus between his squamous cell carcinoma and exposure to herbicide agents during service. His physician stated, “as the International Agency for Research on Cancer (IARC) has classified one of the chemicals in Agent Orange (dioxin) as ‘known to be carcinogenic to humans,’ I would recommend determination by the VA for any service related disability due to his head and neck cancer diagnosis.” However, this opinion is based on an inaccurate premise, as the evidence available for consideration has not permitted VA to concede that he was exposed to herbicide agents. Therefore, the Board must deny the Veteran’s claim for entitlement to service connection for throat cancer. 

The Board acknowledges that the Veteran filed his AMA appeal and sought the evidence review lane, meaning the Board was unable to consider evidence received more than 90 days after its receipt of the Veteran’s VA Form 10182, approximately July 24, 2019. Following that date, however, the law regarding herbicide agent exposure concessions changed as follows:

“Presumptive exposure to herbicide is conceded for veterans who served offshore of the Republic of Vietnam between January 6, 1962, and May 7, 1975, if the veteran served in an offshore location not more than 12 nautical miles seaward of a line commencing on the southwestern demarcation line of the waters of Vietnam and Cambodia and intersecting the geographic points listed in 38 U.S.C. § 1116A(d). See Blue Water Navy Vietnam Veterans Act of 2019, H.R. Res. 299, 116th Cong. (2019) (enacted).”

The effective date of the amendment is January 1, 2020.

Notably, the Board observes a VA memo conceding herbicide agent exposure for this Veteran outside of the evidentiary window. This memo, coupled with his physician’s positive nexus opinion, constitutes favorable evidence that may result in a grant of benefits, should the Veteran decide to file a supplemental claim. The Board encourages and invites the Veteran to file a supplemental claim for entitlement to service connection for throat cancer once more so that this favorable evidence may be considered.

TDIU

For VA purposes, total disability exists when there is any impairment of the mind or body sufficient to render it impossible for the average person to follow a substantially gainful occupation. 38 C.F.R. § 3.340. A total disability rating may be granted where the schedular rating is less than 100 percent and the veteran is unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities. Generally, to be eligible for a TDIU, a percentage threshold must be met. 38 C.F.R. §§ 3.340, 3.341, 4.16(a). 38 C.F.R. § 4.16(a) provides that consideration of such a rating is warranted if a veteran has one service-connected disability rated 60 percent or more or, if there are two or more such disabilities, there must be at least one that is rated 40 percent or more, with all disabilities combining to 70 percent or more. 38 C.F.R. § 4.16(a).

In determining unemployability for VA purposes, consideration may be given to the veteran’s level of education, special training, and previous work experience, but not to age or any impairment caused by nonservice-connected disabilities. 38 C.F.R. §§ 3.341, 4.16, 4.19; Hersey v. Derwinski, 2 Vet. App. 91, 94 (1992); Faust v. West, 13 Vet. App. 342 (2000). The sole fact that a veteran is unemployed or has difficulty securing employment is not enough, as a high rating in itself is a recognition that the impairment makes it difficult to obtain and keep employment. The question is whether the Veteran is capable of performing the physical and mental acts required by employment, not whether he or she can find employment. Van Hoose v. Brown, 4 Vet. App. 361, 363 (1993) (citing 38 C.F.R. §§ 4.1, 4.15, 4.16(a)).

In making a determination, the Board must consider all the evidence of record and make appropriate determinations of competence, credibility, and weight. See Washington v. Nicholson, 19 Vet. App. 362, 368 (2005). When there is an approximate balance of positive and negative evidence regarding any material issue, all reasonable doubt will be resolved in favor of the claimant. 38 U.S.C. § 5107; 38 C.F.R. § 3.102.

In Moore v. Derwinski, 1 Vet. App. 356, 359 (1991), the U.S. Court of Veterans Appeals (now the U.S. Court of Appeals for Veterans Claims) (Court) discussed the meaning of “substantially gainful employment.” In this context, it noted the following standard announced by the United States Federal Court of Appeals in Timmerman v. Weinberger, 510 F.2d 439, 442 (8th Cir. 1975):

It is clear that the claimant need not be a total ‘basket case’ before the courts find that there is an inability to engage in substantial gainful activity. The question must be looked at in a practical manner, and mere theoretical ability to engage in substantial gainful employment is not a sufficient basis to deny benefits. The test is whether a particular job is realistically within the physical and mental capabilities of the claimant.

2. Entitlement to TDIU

Considering the evidence of record prior to July 24, 2019, the Veteran was service-connected for posttraumatic stress disorder (PTSD), rated as 70 percent disabling; tinnitus, rated as 10 percent disabling; and bilateral hearing loss, rated as 10 percent disabling. His combined rating at that time was 80 percent. As each of the Veteran’s disabilities combines to at least a 70 percent disability rating with one disability rated higher than 40 percent, the Veteran meets the schedular requirements for eligibility for a TDIU rating.

The record reflects that the Veteran’s highest level of education is high school; it is unclear from the evidence whether he obtained a diploma. His most recent VA 21-8940 indicates that he last worked full-time in September 2016, the date when he allegedly became too disabled to work. He worked for a roofing company; his highest gross earnings per month were $3,000. 

The Board observes employment information has been provided by two of the Veteran’s previous employers. The Veteran worked for L. Roofing from November 1990 through July 2011. The employer stated that the Veteran’s employment ended because he was laid off in 2011. Thereafter, he performed roofing labor from September 2012 through March 2014 for N. Roofing Company and he quit because “he could not continue tasks.” The Board observes that despite the company indicating he was employed through March 2014, it listed March 2013 as the date he last worked. A second response form was provided by N. Roofing Company in June 2019; this latter form listed September 2016 as the Veteran’s employment end date and included that the Veteran worked approximately 22 hours per week (4-5 hours per day). The employer wrote the following regarding his termination:

“He was told on many occasions that he had to get along with the other workers. His stress level was always intent (sic). Had to let him go for his inability to work with others…The foreman on the jobs warned him several times about his attitude towards his coworkers and inability to work with them.”

The most recent VA examination for the Veteran’s PTSD that the Board can consider occurred in June 2014. The examiner at that time stated that the Veteran’s PTSD manifested as occupational and social impairment with deficiencies in most areas such as work, school, family relations, judgment, thinking, and/or mood. However, when asked to provide an addendum opinion in December 2014 regarding the Veteran’s ability to function in an occupational setting, the examiner alleged as follows:

“This Veteran was observed to be experiencing mood related symptoms of a sufficient nature to warrant him being placed in a high (but not fully) disabled category. The Veteran’s severe state of depression (evidenced by psychomotor slowing and reported anhedonia and irritable mood swings) suggest that the Veteran would have considerable difficulties handling the interpersonal aspects of many jobs, as well as limiting his ability to remain focused on occupational tasks. 

Additionally, the Veteran described major concerns related to sleeplessness, which would also be expected to decrease his ability to perform in a productive fashion in a work setting. Nonetheless, the Veteran’s condition is treatable, and with a combination of mental health therapy and a vocational rehabilitation program that would help further identify his job related strength and weakness[es], he could potentially experience alleviation of those symptoms in the relatively near future that would allow him to function adequately.” 

Shortly after this opinion was provided, it appears that the Veteran was terminated from his position as a roofer due to his inability to get along well with other employees, as seemingly foreshadowed in the examiner’s opinion.

As it relates to the Veteran’s service-connected bilateral hearing loss and tinnitus, the Veteran finds his tinnitus to be distracting, annoying, and interferes with his ability to hear. He reportedly has difficulty hearing in noisy environments, group environments, and hearing from a distance; he says he is able to hear, but not clearly. His hearing loss gives him difficulty in noise, group conversations, using the phone, turning the TV louder than others prefer, and asking people to repeat often. 

Based on the aggregate effects of the Veteran’s service-connected disabilities including his difficulties getting along with others and problems hearing, the Board finds that he is more likely than not precluded from maintaining substantially gainful employment at this time. To that end, the Board will grant entitlement to TDIU. 

 

 

T. MAINELLI

Veterans Law Judge

Board of Veterans’ Appeals

Attorney for the Board Victoria A. Banis, Associate Counsel

The Board’s decision in this case is binding only with respect to the instant matter decided. This decision is not precedential and does not establish VA policies or interpretations of general applicability. 38 C.F.R. § 20.1303.